IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 12, 2005

**STATE OF TENNESSEE v. KENNA JEAN PARROTT**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2002-C-1810     J. Randall Wyatt, Jr., Judge**

---

**No. M2004-00723-CCA-R3-CD - Filed August 5, 2005**

---

Following a jury trial, Defendant, Kenna Jean Parrott, was found guilty of theft of property over $60,000, a Class B felony, and forgery of books and records valued at over $60,000, a Class B felony. The trial court sentenced Defendant as a Range I, standard offender, to eight years for each offense and ordered Defendant's sentences to run concurrently. The trial court ordered six months of the effective eight-year sentence to be served in jail, and the remainder of the effective sentence in Community Corrections. Defendant does not challenge the length or manner of service of her sentence. In her appeal, Defendant challenges the sufficiency of the convicting evidence. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Cynthia F. Burnes, Nashville, Tennessee, for the appellant, Kenna Jean Parrott.

Paul G. Summers, Attorney General and Reporter; Michael Markham, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; Paul DeWitt, Assistant District Attorney General; and Jim Milam, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. State's Proof**

Renea Medling joined Smurfit-Stone Container Corporation on February 1, 2000, as the controller for the company's Nashville facility, Smurfit-Stone Recycling Company ("Smurfit"). Smurfit purchases recyclable material such as cardboard, office paper and aluminum from both individual and corporate customers. Ms. Medling outlined the facility's business procedures in place during Defendant's term of employment as follows.

The vehicle of the customer delivering materials was weighed on an aboveground scale located at the front of the facility. The scale's computer generated a scale ticket with a pre-printed number reflecting the vehicle's weight, the time of the delivery, and the date. The customer then drove the vehicle to the appropriate unloading area. The yard inspector graded and sorted the materials, and gave the customer an inspection ticket which noted the type of recyclable material delivered. The customer returned to the aboveground scale, inserted the scale ticket into the computer, and the weight of the empty vehicle was printed on the scale ticket. The amount payable to the customer was generally based on the difference between the loaded and unloaded truck weights.

The customer presented the scale ticket and the inspection ticket to the "scale" or "weigh" master who was located in a glass booth at the front of the facility. The weigh master entered the customer's scale ticket number and the weight of the delivered material into a computer system. The weigh master typed in the name of the person to whom the check was to be written. The computer printed the check, and the weigh master signed the check. The customer received the check and a copy of the scale ticket. The weigh master retained copies of the check, the scale ticket, and the inspection ticket. These documents were placed in a "daily packet" which reflected all of the deliveries that were made on a particular day and for which a check was issued. A third copy of the check was kept in numerical order in a binder.

The price paid by Smurfit for recyclable material was set monthly by the Official Board Market and reflected a certain dollar amount per ton. In 1999 and 2000, the average rate per ton was between $85.00 and $100.00. The rate price was paid to individual customers who brought recyclable materials to the facility. The facility also offered a negotiated rate price to larger customers, or "account" customers.

Some customers delivered material to the facility without payment. In this situation, the driver might not weigh his or her vehicle before unloading since no payment was expected. This material was included in Smurfit's inventory even though there was no documentation of its receipt. Weather conditions also affected the weight and volume of inventory. Ms. Medling said that these two factors generally caused a variance between the amount of recyclable material purchased during a particular month and the amount of inventory on hand at the end of the month.

Ms. Medling said that the Nashville facility's records were in disarray when she became controller in 2000. Ms. Medling discovered that bills were not being collected, invoices were not being prepared, and account customers were not being paid on a regular basis. The facility's bank statements had not been reconciled for many months. Ms. Medling first focused on improving the facility's billing system and lowering the amount of outstanding receivables. During this period of time, Ms. Medling was not aware that any unauthorized checks had been issued. By May or June 2000, the facility's financial systems were more organized, and Ms. Medling turned her attention to improving the facility's business procedures, including the duties of the weigh master.

Ms. Medling said that Defendant first joined the facility as a temporary employee in July 1999, and was hired as a permanent weigh master on September 13, 1999. Defendant was authorized to sign checks up to $500.00 on the facility's account in November 1999. Defendant worked from 7 a.m. to 4 p.m., but she was often required to work overtime.

During her review of Defendant's job performance, Ms. Medling discovered that Defendant was not properly filing the documents generated in the weigh master's office. Ms. Medling had difficulty matching scale tickets with cancelled checks. Neither issued checks nor bills of lading were filed numerically, and some checks had not been mailed to the account customers. Ms. Medling gave a written warning to Defendant in June 2000 to improve her work, stating that Defendant, among other tasks, had not filed the appropriate scale tickets with the corresponding checks and had not maintained copies of the issued checks in numerical order. A second warning was issued on August 2, 2000, again citing Defendant for failing to maintain the proper filing procedures. On August 17, 2000, Defendant refused to work overtime and left the facility. The following day, Ms. Medling told Defendant that she was no longer employed at the facility.

After Defendant's departure, Ms. Medling began organizing the paperwork in Defendant's office and found boxes of scale tickets and inspection tickets which had not been matched to each other or to a copy of the corresponding customer check. The facility's bank statements had been reconciled by this time, and Ms. Medling noticed that numerous checks were issued to "Carla Fayne." Because of the size and frequencies of the deliveries reflected by the checks, Ms. Medling wondered why Ms. Fayne was not an account customer. Ms. Medling then discovered that Ms. Fayne's name was not listed as the driver on the scale tickets attached to some of the copies of Ms. Fayne's checks, although the name "William Fayne" appeared occasionally. Some scale tickets were marked "void," and others were blank or missing. Ms. Medling eventually determined that 272 checks payable to Carla Fayne had been cashed. A little over two hundred of those checks were signed by Defendant. The first check to Ms. Fayne was written on November 8, 1999, and the last check was dated August 8, 2000. The total amount of the checks cashed by Ms. Fayne during this period was $60,951.67.

On cross-examination, Ms. Medling said that it was the facility's policy not to ask a driver for identification. The weigh master made out the customer's check to whatever name the customer provided. Ms. Medling said that the facility did not have any written procedures or policies. Other employees relieved Defendant for lunch or breaks, and several had signatory authority. Ms. Medling said that she checked the amount of customer checks issued each day but could not usually verify the supporting documents because Defendant did not always give her copies of the scale and inspections tickets generated that day.

On redirect examination, Ms. Medling said that according to payroll records, no checks were issued to Ms. Fayne when Defendant was not at work.

Carla Fayne testified that she had known Defendant for several years, and Defendant was her son's godmother. Ms. Fayne said that she visited Defendant at Smurfit during Defendant's lunch

hour. One day, Defendant gave her a check drawn on Smurfit's bank account and made payable to Ms. Fayne. Defendant asked Ms. Fayne to cash the check. Ms. Fayne kept some of the cash and gave the rest to Defendant. At first, Ms. Fayne said that Kim Perry signed most of the checks because Defendant had not yet been authorized as a signatory on the facility's bank account. It was Ms. Fayne's understanding that Ms. Perry never questioned the checks. After November 8, 1999, Defendant signed the checks issued to Ms. Fayne.

Ms. Fayne said that both she and Defendant were experiencing financial difficulties during this period of time. Ms. Fayne said that they used the money from the cashed checks to pay bills, and to go out to eat and to nightclubs. Ms. Fayne said that she kept between $5,000 and $10,000, and the rest of the money went to Defendant. Ms. Fayne said that none of the checks made payable to her were issued as compensation for the delivery of recyclable material to Smurfit.

At some point after Defendant was fired, Defendant called Ms. Fayne and told her that the F.B.I. had contacted Defendant about the checks. Ms. Fayne said that she eventually told an F.B.I. agent that William Bennett had given her the checks. After Ms. Fayne was arrested on the current charges, she also told the prosecutor that William Bennett had given her the checks, and Ms. Fayne had cashed them and given the money to Mr. Bennett. Ms. Fayne admitted at trial that this story was not true.

Ms. Fayne said that she entered a plea of guilty to the offense of theft of property over $60,0000 because she was guilty. Ms. Fayne admitted that she received the checks from Defendant and kept part of the proceeds. Ms. Fayne said that the prosecutor told her he would recommend that she receive a probated sentence in exchange for her truthful testimony, but he could not guarantee that the trial court would follow his recommendation. Ms. Fayne was also concerned that she would be indicted on federal charges for failure to pay federal income tax on the money obtained from the checks.

On cross-examination, Ms. Fayne agreed that she confessed to the crimes just before her trial was scheduled, and that she initially lied about how she received the checks. Ms. Fayne also conceded that she had several of her personal checks returned for insufficient funds between November 1999 and August 2000. Ms. Fayne said that she did not receive any more checks written on Smurfit's account after Defendant left the facility.

## II. Defendant's Proof

Darlene Hudgens worked as a weigh master for Smurfit for two to three years, but she was working in the customer service department when Defendant was hired. Ms. Hudgens left the facility in May 2000. Ms. Hudgens said that her signature was on one of the checks made payable to Ms. Fayne, although she had no specific recollection of signing the check. Ms. Hudgens said that she never signed a check for a customer who did not deliver materials to the facility, and Defendant never asked Ms. Hudgens to sign a customer's check without the appropriate documentation. Ms. Hudgens said that she signed customer checks when she relieved Defendant for lunch and breaks.

Ms. Hudgens said that the weigh master was required to prepare a daily report for the controller's review which included the checks issued for the day and the corresponding inspection and scale tickets. Ms. Hudgens said that she assisted in an internal audit of the daily packets in April 2000, and all of the supporting documents were present for the issued checks contained in each packet. Ms. Hudgens said that she was not familiar with the name, "Carla Fayne."

On cross-examination, Ms. Hudgens conceded that she may have signed a check for Defendant when Ms. Hudgens was not in the weigh master's office, but Ms. Hudgens insisted that the check would have had a scale ticket attached to it. Ms. Hudgens agreed that she did not know if the signature on the scale ticket was actually the customer's signature. She never saw Ms. Fayne deliver recyclable product to the facility.

Donzaleigh McCord and Patsy Hudgens, employees of Bridgestone/Firestone, Inc., testified that Defendant worked as a temporary employee for the company. Defendant had worked for each of them at some point in time. Each woman said that Defendant was truthful, helpful and pleasant. Ms. McCord and Ms. Hudgens said that Defendant's job duties did not include handling money or checks for the company.

Defendant testified that she began working at Smurfit in June 1999. Defendant said that her job duties as weigh master included printing and preparing checks for the individual customers who delivered recyclable product to the facility. Defendant said that it was the facility's policy not to ask a customer for identification when she prepared a check. Defendant said that she also performed secretarial duties when needed.

Defendant said that her on-the-job training lasted a day and a half. Defendant said that an employee would not sign a customer's check without the appropriate documentation. After Ms. Medling arrived at the facility, Defendant was required to review the checks issued during the day with Ms. Medling before she left work. Defendant was also required to provide the corresponding inspection and scale tickets for each check. These meetings often lasted thirty or forty minutes beyond Defendant's normal working hours. Defendant said that Ms. Medling never questioned the checks made payable to Ms. Fayne.

Defendant said that a customer approached Ms. Fayne one day as she waited for Defendant to finish work. Ms. Fayne recognized the man, and they talked for a few minutes. Ms. Fayne told Defendant that the man, whom Ms. Fayne later identified as William Bennett, wanted Defendant to make his check out to Ms. Fayne instead of him. Mr. Bennett wanted Ms. Fayne to cash the check because he did not have any identification. Defendant said that Mr. Bennett had light brown hair and was about twenty-seven years old. Defendant said that Mr. Bennett's request was not prohibited by the facility's policy because she was not required to verify the identity of the customer before issuing a check.

Defendant said that Mr. Bennett drove various vehicles when he delivered recyclable materials to the facility including a blue box truck, an older white truck, and a flatbed truck. Mr.

Bennett usually delivered loose cardboard. Defendant said that Mr. Bennett began making larger deliveries and talked to one of the facility's sales representatives about become an account customer so that he could obtain a negotiated price rate. Defendant said that she never received any of the proceeds from the checks made payable to Ms. Fayne, and did not learn Mr. Bennett's name until the F.B.I. contacted her about Ms. Fayne's checks. Defendant said that Ms. Fayne told Defendant that she was sorry for pleading guilty to the charged offenses, but that she had to enter a plea "for her kids."

Defendant insisted that Ms. Medling would never have approved the daily packets without the proper documentation, and that every inspection and scale ticket corresponding to a particular check was given to Ms. Medling as part of her daily review. Defendant said that she did not know what happened to the tickets that should have been attached to Ms. Fayne's checks.

On cross-examination, Defendant disagreed with Ms. Medling's assessment that she was performing poorly in her job as weigh master. Defendant admitted that she signed 214 of the checks issued to Ms. Fayne, but said that the signature on one of the checks was not hers. Defendant said that she did not know anything about Mr. Bennett except that he cleaned warehouses. Defendant said that Mr. Bennett sometimes had one or more helpers with him when he came to the facility, and that he drove a pickup truck with a flatbed trailer attached to it. Defendant agreed that a pickup truck could not carry four tons of material, and that the amount of one of the checks to Ms. Fayne reflected a delivery of 7,540 pounds of cardboard.

Defendant agreed that several checks were issued to Ms. Fayne on July 12, 2000, totaling over $1,300.00, and again on July 26, 2000, totaling over $1,900.00. Defendant said that Mr. Bennett made several deliveries on those days, and a helper drove a second truck. Defendant said that the volume of Mr. Bennett's deliveries had increased, and he had become an account customer with a negotiated price rate. Defendant admitted that she wrote Ms. Fayne's name as the driver for one of the scale tickets, and "Carla and William Fayne" as the drivers on another scale ticket. Defendant admitted that one of the scale tickets attached to a check issued to Ms. Fayne reflected "W. E. Ferrell" as the driver. Defendant said that Mr. Ferrell was an actual customer of the facility, and his paperwork had been attached to that check in error.

On redirect, Defendant said that the name "William Fayne" was on some of the checks because that's the name he used if Defendant was not in the weigh master's office when he delivered product.

The State called John Smith as a rebuttal witness. Mr. Smith said that he had worked at the facility for twenty-nine years as a front-end load operator and yard inspector. Mr. Smith said that he graded the materials brought in by customer's and initialed the inspection tickets. Mr. Smith said that he knew the regular drivers but did not remember anyone named "William Bennett" bringing materials in for grading. Mr. Smith said that he would have remembered Mr. Bennett if he made 215 deliveries between November 1999 and August 2000. Mr. Smith said that a pickup truck or box truck could not hold 7,500 pounds of loose cardboard. Mr. Smith said that the driver would need

at least a flatbed truck. On cross-examination, Mr. Smith conceded that some of the drivers used nicknames when presenting their materials for grading. Mr. Smith said that another employee took over his post when he went to lunch.

### III. Sufficiency of the Evidence

Defendant's challenge to the sufficiency of the evidence primarily questions the jury's assessment of the credibility of the witnesses, particularly the testimony of Ms. Fayne and Ms. Hudgens. Defendant also contends that the State did not satisfactorily establish who had access to Smurfit's business records between August 2000 when Defendant left the facility and the date of Defendant's indictment.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

For Defendant's conviction for theft of property over $60,000, the State was required to show that Defendant knowingly obtained control over property valued at $60,000 or more without the owner's effective consent and with the intent to deprive the owner of his or her property. Tenn. Code Ann. § 39-14-103. The aggregate value of stolen property may be used to support the grade of the theft offense "when separate acts of theft are: (1) from the same owner; (2) from the same location; *and* (3) are pursuant to continuing criminal impulse or a single sustained larcenous scheme." *State v. Cattone*, 968 S.W.2d 277, 279 (Tenn. 1998) (citing *State v. Byrd*, 968 S.W.2d 290 (Tenn. 1998) (emphasis in original).

As Defendant argues, the primary evidence against Defendant came through the testimony of Defendant's accomplice, Ms. Fayne. Ms. Fayne testified that Defendant gave her checks written on Smurfit's bank account and made payable to Ms. Fayne. The checks which were payable to Ms Fayne covered a span of approximately nine months and totaled in excess of $60,000. Ms. Fayne cashed each of these checks and split the proceeds with Defendant. Ms. Fayne said that the checks were not issued as compensation for the delivery of recyclable materials.

It is well settled that "'a conviction may not be based solely upon the uncorroborated testimony of an accomplice.'" *Boxley*, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001) (quoting *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001)). The proof necessary to corroborate the accomplice's testimony must include "some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity." *Shaw*, 37 S.W.3d at 903 (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)).

Ms. Medling testified that Defendant was authorized to sign checks on behalf of the facility in November 1999, and that the preparation of customer checks was part of the weigh master's job description. Ms. Medling discovered in May or June 2000 that Defendant was not properly filing the documents generated in her department, and that certain inspection and scale tickets could not be matched with the corresponding customer check. Ms. Medling said that no checks were issued to Miss Fayne from the weigh master's office during the time that Defendant was not at work. Over a period of nine months, which corresponded with Defendant's term of employment with Smurfit, approximately 272 checks were issued to Ms. Fayne totaling in excess of $60,000, over 200 of which were signed by Defendant as weigh master.

Ms. Medling testified that not all of the checks issued to Ms. Fayne were accompanied by a scale ticket. The corresponding scale tickets which were found did not reflect Ms. Fayne as the driver who delivered the materials for which the check was issued. Defendant argues, however, that Ms. Hudgens testified that all of the inspection and scale tickets corresponding to each check issued to Ms. Fayne were present when an internal audit was performed in April 2001. Defendant argues that the State did not establish who had access to Smurfit's business records between the date Defendant left the facility's employment and the date of the indictment charging her with the current offenses.

Ms. Medling acknowledged that Smurfit's business records were in disarray when she joined the facility. Her inability to locate all of the supporting documents for the checks issued to Ms. Fayne goes more to the weight of the State's case. The jury by its verdict obviously credited Ms. Fayne's testimony and rejected Defendant's version of the reason why she issued checks to Ms. Fayne.

Based on our review, we conclude that the evidence was sufficient to support Defendant's conviction for theft of property over $60,000. Defendant is not entitled to relief on this issue.

Defendant was charged with "intentionally or knowingly forg[ing] a writing described or depicted as follows: business records of Smurfit Stone Container Corporation, d.b.a. Smurfit Recycling Company, of the value of $60,000 or more, with the intent to defraud or harm another, to wit: Smurfit Stone Container Corporation, d.b.a. Smurfit Recycling Company, and others whose identity is unknown to the Grand Jury." "A person commits an offense who forges a writing with intent to defraud or harm another." Tenn. Code Ann. § 30-14-114(a). "'Forge' means to . . . make

false entries in books or records." *Id*. § 39-14-114(b)(1)(B). "'Writing' includes printing or any other method of recording information . . . ." *Id*. § 39-14-114(b)(2). The offense of forgery is punishable as theft pursuant to Tennessee Code Annotated section 39-14-105. *Id.* § 39-14-114(c).

Ms. Medling testified that the weigh master's job, in part, was to maintain and prepare the facility's books and records to reflect the customers' delivery transactions. These records included the scale ticket, the customer's check, and the inspection ticket for each transaction. Ms. Medling said that the supporting documentation for the checks issue to Ms. Fayne were altered in a number of ways, were missing, or were simply left blank. Ms. Fayne testified that she never delivered recyclable material to the facility even though Defendant recorded her as the customer in the company's books. Ms. Fayne said that Defendant issued the checks to her and altered the company's records so that she and Defendant could pay bills, go out to eat, and go to clubs. Based on the evidence presented, the evidence is sufficient to support Defendant's conviction for forgery of the company's books and records valued over $60,000. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a review of the record, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE