IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 11, 2001

## STATE OF TENNESSEE v. STANLEY BOXLEY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 98-08758 - 59     W. Fred Axley, Judge**

---

**No. W2000-00983-CCA-R3-CD - Filed October 26, 2001**

---

The Defendant, Stanley Boxley, was convicted by a jury of first degree felony murder and attempted aggravated robbery. He was sentenced to life imprisonment for the murder and to a consecutive ten year term for the attempted aggravated robbery. In this appeal as of right the Defendant contends that there is insufficient evidence to sustain his convictions and that the trial court erred by ruling that the State could introduce evidence of threats against the accomplice witnesses if the Defendant inquired into the prosecution's recommendation that they receive probation. Finding the evidence insufficient to corroborate the accomplices' testimony, we reverse the Defendant's convictions and dismiss.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Dismissed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

Garland Erguden, Memphis, Tennessee (on appeal); William L. Johnson and Dianne Thackery, Memphis, Tennessee (at trial), for the Appellant, Stanley Boxley.

Paul G. Summers, Attorney General and Reporter; Laura E. McMullen, Assistant Attorney General; William L. Gibbons, District Attorney General; and Thomas Henderson, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

Chester Arthur Wright Jr. and his fiancé, Geneva Y. Harvey, lived in a townhouse apartment with four children. Wright admitted that he sold marijuana from this location. On the night of February 10, 1998, three of the children were upstairs asleep; Wright, Ms. Harvey and the youngest child were lying on the sofa bed downstairs. As Wright was falling asleep, he heard a kick at the front door. He looked up and, through the glass panel in the door, saw an orange Miami Dolphins jacket. Fearing a break-in, he jumped up and ran to get his shotgun. The door was kicked again,

burst open, and two men entered the apartment. Wright testified that he thought the men saw him with the shotgun, because one of them fired a shot. The two men then ran out of the apartment. Wright followed them to the door and saw them split up. He testified that a shotgun was left behind, outside his doorstep. Wright explained that he did not get a good look at either of the intruders, and did not see the shot being fired. When Wright went to check on Ms. Harvey, he found her lying in a pool of blood. She had been killed by a single bullet which struck her in the forehead.

Wright testified that he did not know who the Defendant was prior to the preliminary hearing. He stated that only himself, the prosecutor, the judge, and a "couple of inmates" were present at the hearing. There, he stated, one of the inmates -- whom he subsequently learned was the Defendant -- "[s]tarted going off on me, talking bad to me, asking me did I want him or what kind of problem did I have; just making facial expressions like he was going to get me or something like that." Wright subsequently admitted that the Defendant did not "verbally say anything"; rather, the Defendant pointed at him and was "[j]ust mouthing it and directing it toward me."

Momodu Jatta was one of Wright's neighbors. Jatta testified that, on the night in question, he was upstairs looking out of his daughter's window when he saw a four door gray Cavalier with a luggage strip on the trunk back into a parking space. There were three persons in the car. One person got out, looked around, and then returned to the car and spoke to the others. The other two men then got out of the car. Jatta watched the three men go to the apartment next to his. He heard a loud noise as they kicked in the door, and Jatta saw the men go inside the apartment. They then came out running and, Jatta testified, got back into the gray car -- which had been left running -- and left. Jatta stated that one of the men was wearing a jacket with a hood. Jatta described the men as three black males whom he had never seen before.

Officers on the scene recovered Wright's twelve gauge pump shotgun from inside Wright's apartment. From the area outside Wright's apartment, officers recovered a spent shell casing, a hockey mask, white latex gloves, a black skull cap, a blue skull cap, and a blue jacket.

Marco Dewayne McKay testified that he and the Defendant had discussed a robbery earlier that day. McKay explained that the Defendant told him the robbery would result in a "lot" of marijuana and "possibly some money." To facilitate the crime McKay stole a gray Buick Century car. McKay and the Defendant gathered some guns and were joined by Marcus Toney. Another man, "Big Juan," was also involved as the getaway driver, driving a second car.

According to McKay, he, the Defendant, and Toney drove to Wright's apartment in the stolen vehicle. McKay was driving and backed into a space. He left the car running because he could not turn it off, as he had started it with a screwdriver. McKay put on a hockey mask and grabbed a gun; he testified that his gun was unloaded. The three men approached Wright's door. McKay and the Defendant were facing it while Toney stood to the left with his back against the wall. McKay kicked the door once, but it did not open. He and the Defendant then kicked it together and it opened. McKay testified:

> When the door came open, I saw, I guess it was somebody from the left hand side of the room jump up. And I heard one shot. When I heard the shot I broke and ran. I dropped my gun and ran to where the second car was.

McKay got into the car being driven by Big Juan; the Defendant, he stated, drove up in the stolen car and abandoned it, getting into the car driven by Big Juan. McKay testified that the Defendant had recovered the two guns that he and Toney had dropped. The three men left the scene.

McKay explained that he, Toney and the Defendant had three guns: two "long guns" and one pistol. He stated that he and Toney had the long guns, and the Defendant had the pistol. He also explained that he and Toney checked their guns before committing the attempted robbery and that both of their guns were unloaded. He testified that he didn't know whether or not the Defendant's pistol was loaded.

McKay stated that, after he was arrested, he admitted his involvement in the crime and also told the police of the Defendant's participation. He admitted that he did not initially tell the police about Big Juan. He admitted that he made a deal with the State to accept fifteen years at thirty percent on the charge of facilitation of first degree murder in exchange for his testimony.

On cross examination, McKay admitted that his first statement to the police was not true. He also admitted that his second statement to them contained lies. He also admitted that the facilitation charge had been dropped and that, as of the time of trial, the only offense he was charged with was attempted aggravated robbery.

Marcus Toney testified that he agreed to help the Defendant commit the robbery because he needed the money. He joined McKay and the Defendant in the gray car; the men already had a shot gun and a pistol, but they drove to a friend's house to pick up a rifle. He stated that the Defendant went in to get the third gun and returned with a "410 rifle." They returned to their neighborhood where they rendezvoused with Big Juan. Big Juan, he explained, was going to drive the getaway car.

McKay, Toney and the Defendant drove over to Wright's apartment in the gray car. McKay backed into a parking space and, Toney testified, they sat in the parking lot for approximately three to five minutes. Toney got out of the car, looked around, and got back in the car. Toney expressed doubts about their planned activity. The other two convinced him to proceed, and the three men approached the porch. Toney stood with his back to the wall to the left of the door; McKay and the Defendant positioned themselves to kick it open. As McKay and the Defendant started to kick, Toney yelled, "Stop!" The Defendant stopped but McKay kicked the door; it held. McKay and the Defendant then kicked the door together and it opened. He testified that McKay then yelled, "Freeze, metro narcotics." At that point, Toney stated, the Defendant fired one shot and all three men "took off running." Toney ran down a hill, dropped his gun, and hid in some bushes. He eventually walked home, having missed his ride in the getaway car.

-3-

Toney testified that he had checked his rifle before exiting the car, and that it was empty. He stated he did not know whether McKay's gun was loaded. He explained that he thought the robbery was supposed to result in about fifteen pounds of marijuana and a "bunch" of cocaine.

Toney admitted entering into an agreement with the State to accept fifteen years on facilitation of murder in the first degree in exchange for his testimony. Toney also explained that, as of trial, he was charged with attempted aggravated robbery.

## SUFFICIENCY OF THE EVIDENCE: ACCOMPLICE TESTIMONY

The Defendant contends that the evidence is insufficient to sustain his convictions because there is no proof connecting him to the crimes other than the alleged accomplices' testimony. We must agree with the defendant's contention.

### A. Accomplice Status

As our supreme court has recently reiterated, "[i]n Tennessee, a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)). Furthermore, accomplices cannot corroborate each other. State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995). "An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). The general test is whether the accomplice would be indicted for the offense charged against the defendant. *Id.* (citations omitted). McKay and Toney were originally charged with facilitation of first degree murder but were subsequently indicted only for attempted aggravated robbery. The defendant was indicted for felony murder and attempted aggravated robbery with attempted aggravated robbery being the underlying felony for the felony murder. Thus, at the time of trial, McKay and Toney stood indicted for the same offense of attempted aggravated robbery as was the defendant, and this offense also served as the underlying felony for the defendant's felony murder charge.

The state does not argue that McKay and Toney were not accomplices, but rather argues their testimony was sufficiently corroborated. We are constrained to hold under Tennessee law that McKay and Toney were accomplices as a matter of law based upon their testimony and indictments.[1]

### B. Corroboration

---

[1] The trial court in its jury instructions told the jury that it was for the jury to decide whether or not McKay and Toney were accomplices. We conclude this instruction was in error. *See* State v. Anderson, 985 S.W.3d 9, 16 (Tenn. Crim. App. 1997) (holding it is for the trial court, not the jury, to determine accomplice status where it is clear and undisputed that the witness participated in the crime). This faulty instruction does not relieve our responsibility to determine the sufficiency of the evidence based upon our determination that the witnesses were accomplices as a matter of law.

Our supreme court has set forth the quantum of proof necessary to establish sufficient corroboration as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

Shaw, 37 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803). In other words, the corroboration must include some fact establishing the identity of the defendant as a criminal actor. It is generally for the jury to determine whether sufficient corroboration exists. Shaw, 37 S.W.3d at 903. However, as this Court has previously pointed out, "[e]vidence which merely casts a suspicion on the accused . . . is inadequate to corroborate an accomplice's testimony." State v. Griffis, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997).

## C. Analysis

The state argues the testimony of the two accomplices is corroborated by the following:
1. The neighbor saw the gray Cavalier, with three African-American males, back into a parking space;
2. The three men walked past the neighbor's apartment, and he heard them kicking in the door;
3. Various witnesses testified the door was kicked in;
4. Wright saw two men in his doorway, heard the shot, and saw the men fleeing, one of whom was an African-American;
5. Wright testified one of the men had a shotgun;
6. Officers found masks, skullcaps and a blue jacket at the scene; and
7. Witnesses corroborated the time of the offense being around midnight.

In summary, the state argues "the witnesses' testimony corroborated the time the crime occurred, the type vehicle used, the manner in which the offense was committed, and the number and race of persons present."

Unfortunately, none of this evidence relates to the identity of the defendant. It is not enough to simply corroborate that a crime has been committed in a manner described by the accomplices. See Shaw, 37 S.W.3d at 903. The record is devoid of any independent evidence connecting the defendant to the two accomplices, the gray Cavalier, the crime scene or the surrounding area, the weapons, the masks, the skullcaps, or the clothing found or described by witnesses.

The only evidence arguably relating to the identify of the defendant is Wright's testimony that the defendant was "mouthing" and "making facial expressions" at him at the preliminary

hearing, where only Wright, the prosecutor, the judge and a "couple of inmates" were present. We are unable to conclude that this evidence is sufficient corroboration that the defendant participated in the crime.

Thus, the evidence is insufficient to support the guilty finding.

## ADMISSIBILITY OF DEATH THREATS

Although our ruling on the sufficiency of the evidence makes the remaining issue moot, we address it in the event of a further appeal to our supreme court.

### A. Factual Background

McKay and Toney were each initially charged with facilitation of murder in the first degree in connection with these offenses. After the State had entered into its agreements for 15 years for facilitation with McKay and Toney at the preliminary hearing, the State determined that it could not pursue prosecution against McKay and Toney on this charge. Accordingly, the State, after the preliminary hearing, sought and obtained indictments against McKay and Toney for attempted aggravated robbery. The maximum sentence faced by McKay and Toney for this offense was six years.[2]

During the Defendant's trial, and before McKay or Toney testified, the prosecuting attorney informed the trial court and defense counsel, out of the presence of the jury, that McKay and Toney had received death threats. Supposedly, these death threats were made in conjunction with the Defendant's alleged status as a member of the gang known as the "Gangster Disciples." However, the prosecuting attorney told the trial court:

"[I]n all candor, we cannot say the threat came from Stanley Boxley. . . . [T]he proof of that threat would not be admissible to prove the defendant's guilty knowledge, because we cannot tie that threat to him. On the other hand, the fact that these two witnesses, if they are still willing, are willing to get up and testify to what they have said in the past – and I assume are going to say again – in the face of a death threat for doing it, I think, goes to their credibility. Even though it is not evidence against the defendant, it does go to their credibility should their credibility be attacked.

Accordingly, the State determined to recommend "that if [McKay and Toney] decided to plead guilty [to attempted aggravated robbery], [the State] was going to recommend to the court that the court place them on probation. . . . Not because they particularly deserve it, but because if they go to the Department of Correction, [the State] do[es] not believe they would live to finish any

---

[2]Attempted aggravated robbery is a Class C felony. See Tenn. Code Ann. §§ 39-12-107(a); 39-13-402(b). Apparently, then, McKay and Toney qualified for sentencing as Range I offenders, because the maximum Range I sentence for a Class C felony is six years. See id. § 40-35-112(a)(3).

sentence on an attempt[ed] aggravated robbery given the conditions at the Department of Correction." The prosecuting attorney informed the trial court that he had already told McKay and Toney, as well as their attorneys, of his decision to recommend probation.

In conjunction with the prosecuting attorney informing the trial court of these developments, the prosecutor stated that he did not intend to inquire about the threats during direct examination, but set forth his intention to bring out the death threats in response to any questions by defense counsel about the recommendation of probation, which he anticipated defense counsel doing in an attempt to impeach McKay's and Toney's credibility. The prosecuting attorney stated his intent to ask the accomplices about the original agreement for 15 years had they been indicted on the facilitation charge; however, he stated, "[W]e will end with the fact that they are going to plead guilty to what they have been charged with [attempted aggravated robbery]. . . [with] the Range of punishment; it's three to something."

Defense counsel argued that the threats should not be admitted at all, and that a contrary ruling would limit the ability to effectively cross-examine McKay and Toney. The trial court overruled defense counsel's objection, finding that defense counsel was

> not prevented from pursuing whether or not they were offered probation. But should that happen and should the district attorney want to pursue why they offered them probation, then I'm going to allow them to do that. . . . [T]he evidence cannot mislead the jury. And to only allow [defense counsel] to pursue an offer of immediate probation after they testify and not allow the jury to know why they were offered probation, so that we don't put them in a penal institution where their life would mean nothing, would be to mislead the jury.

Accordingly, the trial court ruled the prosecution would be allowed to introduce evidence of the death threats if defense counsel inquired into the State's recommendation that McKay and Toney receive probation.

McKay subsequently testified before the jury that the state had offered him a plea agreement at the time of the preliminary hearing of 15 years for facilitation of first degree murder. When asked what benefit he expected to receive for testifying and knowing the plea offer was for probation, McKay stated, "I don't expect anything other than what we agreed to on the paper that he read to you."[3] The prosecutor subsequently asked, "What did I say I would do with the memorandum of understanding [15 years for facilitation] if you lied?" McKay responded, "You would tear it up." McKay also testified that he was only charged at the time of trial with attempted aggravated robbery. The jury was never informed of the state's recommendation of probation for his truthful testimony, nor was the jury informed that the defendant intended to plead guilty to the charged offense of attempted aggravated robbery.

---

[3]We conclude that both McKay and Toney knew the plea offer was for probation based upon the prosecuting attorney's earlier statement to the trial court that he had already told both of them, as well as their attorneys, that he would recommend probation.

Toney also testified before the jury that the state had offered him a plea agreement at the time of the preliminary hearing of 15 years for facilitation of first degree murder. When asked what benefit he expected for testifying and knowing the plea offer was for probation, he stated, "The 15 years that I signed for." When asked by the prosecuting attorney what would happen to the agreement for the 15-year sentence if Toney lied, Toney stated, "It would be dismissed, and I would do a full life sentence of 25 years with no parole." Toney responded affirmatively when the prosecuting attorney asked, "I told you I'd tear it up, didn't I." Toney also acknowledged that, at the time of trial, he was only charged with attempted aggravated robbery which carries from one to six years. The jury was never informed that the state had agreed to recommend probation for his truthful testimony, nor was the jury informed that the defendant intended to plead guilty to the charged offense of attempted aggravated robbery.

The Defendant now contends that the trial court's ruling was error. The Defendant points out that the prosecutor admitted to the trial court that the death threats could not be attributed to him, and that their relevance was therefore minimal while the danger of unfair prejudice was substantial. The State disagrees, and further points out that this issue is waived because of the Defendant's failure to timely file his motion for new trial.

### B. Untimely Motion for New Trial

The Defendant concedes that his motion for new trial was not timely filed. A motion for new trial "shall be made . . . within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). The time for filing a motion for new trial is mandatory and may not be extended. Tenn. R. Crim. P. 45(b); State v. Johnson, 980 S.W.2d 414, 418 (Tenn. Crim. App. 1998). "The thirty (30) day provision is jurisdictional, and an untimely motion is a nullity." State v. Johnson, 980 S.W.2d at 418. The Defendant's order of sentence was entered on February 16, 2000. His motion for new trial was not filed until March 21, 2000, more than thirty days later. Thus, the Defendant has waived his right to appeal any of the issues he raised in his motion for new trial other than sufficiency of the evidence and sentencing. See State v. Patterson 966 S.W.2d 435, 440 (Tenn. Crim. App. 1997).

### C. Plain Error

While this Court does not have the authority to waive the untimely filing of a motion for new trial, we may take notice of an error which affects the Defendant's substantial rights where necessary to do substantial justice. Id.; see also Tenn. R. Crim. P. 52(b). The Defendant argues that the trial court's ruling on the admissibility of the death threats constitutes "plain error."

### (1) Bolden Requirements

We first note that accomplice testimony is generally admissible even though it is the product of a plea agreement. State v. Bolden, 979 S.W.2d 587, 590 (Tenn. 1998). However, deception of the court and jury by the presentation of known false evidence is incompatible with due process. Giglio v. United States, 405 U.S. 150, 153-54, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). Our Tennessee Supreme Court has adopted the following requirements for testimony procured through a plea agreement in order to meet the constitutional demands of due process and a fair trial:

(1) full disclosure of the terms of the agreements struck with the witnesses;

(2) the opportunity for full cross-examination of those witnesses concerning the agreements and the effect of those agreements on the testimony of the witnesses; and

(3) instructions cautioning the jury to carefully evaluate the weight and credibility of the testimony of such witnesses who have been induced by agreements with the State to testify against the defendant.

Bolden, 979 S.W.2d at 590 (citations omitted).

A violation of the Bolden requirements results in a violation of the constitutional right to due process. Id. We conclude that such a violation would be "plain error" under Tenn. R. Crim. P. 52(b). See generally State v. Eldridge, 951 S.W.2d 775, 784 (Tenn. Crim. App. 1997) (discussing "plain error" doctrine).

## (2) Analysis

In this case it is undisputed that the two accomplices, at the time of trial, had been offered a plea agreement for probation for attempted aggravated robbery. It is further undisputed that the jury was never informed of such a plea offer and, in fact, was led to believe otherwise. Both accomplices testified that they expected the 15-year sentence for their truthful testimony, even though each conceded he was only charged with attempted aggravated robbery at the time of trial. The trial court understandably did not want the jury to be misled. Therefore, it concluded the alleged death threats, though not tied to the defendant, would be admissible if defense counsel cross-examined about the plea agreement for probation. However, the fear of the trial court indeed came to fruition: the jury was misled. Although we in no way mean to imply that the state intended such a result, we can only conclude that the accomplices' testimony was false and misleading since it was and is undisputed the state offered probation prior to their testimony.

We realize this problem resulted from the state's intention, based upon the trial court's ruling, to introduce evidence of the alleged death threats if the defendant questioned the accomplices about the offer of probation. This, in effect, greatly hampered the defendant's ability to cross-examine the accomplices about the true plea agreement. Yet, the state conceded at trial it could not tie the alleged threats to the defendant. Although we understand why the state would want the jury to know why it offered probation, this must be balanced against the constitutional right of cross-examination, especially when the state is unable to tie alleged threats to the defendant. We conclude the trial court's ruling precluded the defendant from the opportunity of full cross-examination of the accomplices.

**D. Summary**

Based upon the above analysis, we can only conclude that the <u>Bolden</u> requirements were breached, and the defendant's due process rights were violated since (1) there was no "full disclosure of the terms of the agreements struck with the witnesses;" (2) the jury was mislead by the state witnesses' false testimony regarding the true plea agreement; and (3) defendant was deprived of the "opportunity for full cross-examination of those witnesses concerning the agreements and the effect of those agreements on the testimony of witnesses" due to the ruling of the trial court. <u>Bolden</u>, 979 S.W.2d at 590. We further conclude this was "plain error." Since the only testimony placing the defendant at the crime scene came from the accomplices, the state has not shown this error was harmless beyond a reasonable doubt. *See* <u>State v. Ely</u>, 48 S.W.3d 710, 725 (Tenn. 2001) (holding harmless error based upon a constitutional violation requires the state to prove harmlessness "beyond a reasonable doubt").

Accordingly, even if the evidence were sufficient to support the conviction, we would still reverse and remand for a new trial based upon this due process violation.

**CONCLUSION**

Based upon our careful review of the record, we are unable to find corroboration of the testimony of the two accomplices. Therefore, the conviction is reversed and the case dismissed.

_____
ROBERT W. WEDEMEYER, JUDGE