IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 21, 2005

## STATE OF TENNESSEE v. TERRANCE YVES SMOTHERS

**Appeal from the Circuit Court for Montgomery County**
**No. 40300629     John H. Gasaway, Judge**

---

**No. M2005-00784-CCA-R3-CD - Filed February 9, 2006**

---

Following a bench trial, the Defendant, Terrance Yves Smothers, was convicted by the Montgomery County Circuit Court of aggravated robbery, misdemeanor theft, and two counts of especially aggravated kidnapping. The Defendant received an effective twenty-year sentence for these convictions. The single issue presented for our review is whether the testimony of the accomplice was sufficiently corroborated. After a review of the record, we find that the evidence is insufficient to corroborate the accomplice's testimony and, therefore, reverse and dismiss the judgments of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed;**
**Case Dismissed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Timothy R. Wallace, Clarksville, Tennessee, for the appellant, Terrance Yves Smothers.

Paul G. Summers, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; John Carney, District Attorney General; and John Finklea, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

At approximately 10:00 p.m. on May 21, 2003, eighteen-year-old Jason Taylor returned to his Clarksville home after picking up his two sisters. He was driving his white, two-door Oldsmobile Cutlass. Upon arrival, his sisters went inside the residence, but he remained in the driveway as his fourteen-year-old brother Justin Taylor was "coming up the street." At this time, a masked man came running from the back of the house, forced both boys at gunpoint to get inside

Jason's vehicle, and ordered them to put their heads between their legs. The assailant then drove the boys around the neighborhood. According to Justin, while in the car, the assailant kept the gun pointed at Jason's head. Jason described the gun as "a .45 and had a laser site on it."

During the drive through the neighborhood, the assailant took the detachable CD player face and demanded that Jason tell him where the key to the "wheel locks" was located. Jason answered that the key was at his house. The assailant then returned to the Taylors' residence and told Jason that "he had forty-seconds to get the . . . key for the wheel locks[.]" Jason went inside the house, retrieved the key, and returned to the vehicle. The assailant took the key to the "wheel locks" and again began driving. After leaving the neighborhood, the assailant stopped the vehicle and told the boys that they "had ten seconds to get out of the car." The boys exited the vehicle and, at this time, they observed a car behind him that "cut [its] lights off" and passed them.

Earlier that evening, Jason Taylor had observed a "beige tan-colored car" with a dark brown "vinyl top" following behind him. He stated that when he "pulled to the side to pick up [his] sisters, they drove by slowly and they just left." Jason recognized the car that "cut [its] lights off" as the same one that had followed him home earlier in the evening. Justin Taylor testified that, when he was walking home, he observed a four-door Oldsmobile Cutlass in the area. He described the vehicle as "like a light tan with a dark brown top."

Justin described the masked assailant's clothing as "dark bluejeans and like a darker – like a dark colored [long-sleeved] pull over and like some thick, maybe Army or like thick gloves." Justin stated that he viewed the assailant's wrists, which were "like a light-color[,]" and that the assailant was "five six to six foot" in height. Jason Taylor's description of the assailant was substantially similar to that of his brother. He added that the assailant's "voice sounded like Ice Tea, the Rapper[.]" On cross-examination, Jason testified that, in his statement to police, he stated that the assailant was "a light-skinned black male."

Jason Taylor's vehicle was subsequently found, but it was in "no condition of driving, it was burned[.]" Jason testified that items taken from the vehicle that night included a three-thousand-dollar stereo system and a set of rims worth twenty-five hundred dollars.

At approximately 10:00 p.m. the following evening, Detective Kenneth Austion of the Clarksville Police Department stopped Travis Otey, who was driving his "beigish" Oldsmobile Cutlass. According to Austion, he stopped Otey because he had been informed that Otey "was a suspect in an incident that occurred sometime earlier that week and that he might be in possession of some items that were stolen." Detective Austion found speakers and stereo equipment inside the car, which were later identified as items stolen from Jason Taylor's vehicle.

Otey implicated the Defendant in the crimes. On September 3, 2003, a Montgomery County grand jury indicted the Defendant, along with Travis Otey, for conspiracy to commit aggravated robbery, aggravated robbery, Class C felony theft, carjacking, and two counts of especially aggravated kidnapping.

Pursuant to an agreement with the State, Otey testified at the Defendant's January 21, 2005 trial and provided the following version of events. Otey stated that, on May 21, 2003, he and the Defendant went to Wal-mart, and they purchased a BB gun with an "infrared beam on it[,]" which looked like a pistol. Later that evening, the two men were riding in Otey's Oldsmobile Cutlass in the neighborhood of Bo Peep Lane, the location of the Taylor residence. Otey described his Oldsmobile as white with a maroon top and stated that they were in this area upon the Defendant's instruction. Once in the Bo Peep Lane area, Otey let the Defendant out of the car. He then met the Defendant several minutes later, who was now driving a white, two-door Oldsmobile Cutlass. Otey stated that he had seen this vehicle about "fifteen to twenty minutes before then."

Otey followed behind the Defendant in his vehicle. According to Otey, the Defendant motioned for him to turn around, and both cars returned to the residence on Bo Peep Lane. Otey stated that, when he arrived at the house, "there was somebody getting back in the car" driven by the Defendant. Otey testified that he again followed the Defendant away from the residence. Thereafter, the car driven by the Defendant stopped, and Otey observed two individuals exit the vehicle. Upon observing this, Otey "hit [his] lights." Both cars then proceeded to the end of the road, and the Defendant and Otey went in separate directions.

According to Otey, he did not see the Defendant again until the following morning, when the Defendant called him from his girlfriend's house to pick him up. Otey testified that "they got the rims and amp and went across town to Kraft Street . . . [t]o the car wash . . . [t]o sell the rims[.]" Otey stated that, upon arriving at the Kraft Street business, "[s]omebody came out there and looked in the car at the rims and then went back and we left." Otey testified that only the Defendant got out of the vehcile. Additionally, Otey stated that the Defendant gave him stereo equipment "[f]or taking him to sell the rims[.]"

After Otey and the Defendant left the Kraft Street business, they proceeded to James McCullen's house. According to Otey, James and his wife Melanie were present in the home, and James looked at the rims. Otey testified that "[w]e messed around for an hour or so and then we left, and left the rims there." On cross-examination, Otey stated that, on a prior occasion, he had been with the Defendant when he had purchased rims for his car from Mike Jones Automotive.

Following Otey's testimony, the State called several witnesses to corroborate Otey's testimony. First, the State called Lamont Smith, owner of the business on Kraft Street. However, Mr. Smith testified that the Defendant never brought rims to his store.

The State next called Anthony Guinyard, an employee of the Kraft Street business, to testify. Mr. Guinyard testified that the Defendant brought a pair of rims into the Kraft Street business and spoke with Mr. Smith. Mr. Guinyard stated that the Defendant then left the store but returned "three hours later" to retrieve the rims. According to Mr. Guinyard, a man named Travis was with the Defendant when he returned to the store. On cross-examination, Mr. Guinyard testified that he did not know when the Defendant came to the store, only that it was approximately "two and a half years ago." He also admitted that he never saw the rims. Additionally, it was established that, while Mr.

Guinyard was in court on unrelated charges, he was approached by officers, who "came to offer me some help, . . . saying if I knew something" about the charges against the Defendant.

The State then called Melanie McCullen, the wife of James McCullen, who testified that James often looked at auto parts for sale. She testified that she could not recall whether the Defendant had ever brought rims to her house, but she stated that "[c]ould have been, I wouldn't say no." The State then recalled Lamont Smith, who testified that Mr. Guinyard was lying if he stated that Mr. Smith met with the Defendant about purchasing rims.

The State also called Mr. Dick Stovall, a security manager at Wal-mart and custodian of records . Mr. Stovall testified that, on May 21, 2003, at 4:56 p.m., someone purchased a pellet pistol and a laser site that could be attached to the pistol. Mr. Stovall could not identify the individual who purchased this pistol. Finally, the State called Terrence Welsh, with the Montgomery County Sheriff's Office, Jail Division, to testify. At this time, counsel for the Defendant stipulated that the Defendant had escaped from jail, while he was incarcerated on other charges but following the present charges. The State rested, and the Defendant did not offer any evidence on his own behalf.

During its case-in-chief, the State entered into evidence a ski-mask and photographs of the rims, stereo equipment, and the key for the wheel locks. While testimony established that the stereo equipment was located in Otey's vehicle, no testimony was provided regarding if the rims and the key for the wheel locks were located and, if so, where. The ski-mask was only identified by witnesses as being similar to the one worn by the assailant. At the conclusion of the evidence, the trial court determined that the accomplice Otey's testimony was sufficiently corroborated and found the Defendant guilty of aggravated robbery, misdemeanor theft, and two counts of especially aggravated robbery.

At the sentencing hearing, the Defendant again argued that the accomplice's testimony was not sufficiently corroborated. The trial court considered the Defendant's argument as an oral motion for a judgment of acquittal "made in conjunction with the presentation by the Defendant of his motion for new trial."[1] The trial court continued the hearing in order to consider the Defendant's argument and, on March 16, 2005, denied the Defendant's motion. Thereafter, the trial court sentenced the Defendant to an effective twenty-year sentence[2] in the Department of Correction, to be served consecutively to a prior three-year sentence for aggravated assault. This appeal followed.

---

[1] It does not appear that a motion for new trial was ever reduced to writing and filed as required by Tenn. R. Crim. P. 33(b). However, we will address the sufficiency of the evidence issue because this issue is reviewable notwithstanding the untimely motion for new trial. See State v. Boxley, 76 S.W.3d 381, 390 (Tenn. Crim. App. 2001).

[2] The Defendant was sentenced to twenty years as a violent offender for each especially aggravated kidnapping conviction. He received a sentence of ten years as a Range I, standard offender for the aggravated robbery conviction and a sentence of eleven months and twenty-nine days for the misdemeanor theft conviction. All sentences were to be served concurrently in the Department of Correction.

## ANALYSIS

Relying on this Court's decision in State v. Boxley, 76 S.W.3d 381 (Tenn. Crim. App. 2001), the Defendant argues that the accomplice's testimony was insufficiently corroborated to support his convictions. That is, none of the witnesses other than Travis Otey, the accomplice,[3] could identify the Defendant as a participant in the crimes.

It is well settled that, "[i]n Tennessee, a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)). This "very salutary rule" is designed to prevent the "obvious dangers" of allowing a defendant to be convicted solely on the basis of an accomplice's testimony. Sherrill v. State, 321 S.W.2d 811, 814 (Tenn. 1959). However, Tennessee law requires only a modicum of evidence in order to sufficiently corroborate the testimony of an accomplice. State v. Copeland, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984).

With respect to the nature, quality, and sufficiency of the evidence necessary to corroborate an accomplice's testimony, this court has held:

> The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.
>
> . . . .
>
> The evidence corroborating the testimony of an accomplice may consist of direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. The quantum of evidence necessary to corroborate an accomplice's testimony is not required to be sufficient enough to support the accused's conviction independent of the accomplices testimony nor is it required to extend to every portion of the accomplice's testimony. To the contrary, only slight

---

[3] At the trial court level, the State disputed whether Travis Otey was an accomplice. "An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). The general test is whether the accomplice would be indicted for the offense charged against the defendant. Id. (citations omitted). Otey was originally charged in the same indictments as the Defendant. In this state, if the offense in question was not committed by the person's own conduct, the person may, nonetheless, be criminally responsible as a principal to the offense if the person "solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (2003). We are constrained to hold that, under Tennessee law, Otey was an accomplice as a matter of law based upon his testimony and the indictments.

circumstances are required to corroborate an accomplice's testimony. The corroborating evidence is sufficient if it connects the accused with the crime in question.

State v. Griffis, 964 S.W.2d 577, 588-89 (Tenn. Crim. App. 1997) (citations omitted).

The proof necessary to corroborate the accomplice's testimony must include "some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. . . . " Shaw, 37 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803). In other words, the corroboration must include some fact establishing the identity of the defendant as a criminal actor. Boxley, 76 S.W.3d at 387. It is generally for the trier of fact to determine whether sufficient corroboration exists. Id. (citing Shaw, 37 S.W.3d at 903). However, as this Court has previously pointed out, "[e]vidence which merely casts a suspicion on the accused . . . is inadequate to corroborate an accomplice's testimony." Id. (quoting Griffis, 964 S.W.2d at 589).

In Boxley, three men were involved in an attempted robbery, which resulted in the shooting death of one of the victims. Two of the men confessed to their involvement in the crime and implicated the defendant as a participant in the aborted robbery. Although the State's witnesses could corroborate the accomplices' testimony as to "the time the crime occurred, the type vehicle used, the manner in which the offense was committed, and the number and race of persons present[,]" none of the State's evidence "relate[d] to the identity of the defendant." Id. Based on the facts presented in Boxley, this Court concluded that the evidence was insufficient to corroborate the defendant's participation in the crime.

In the present case, the State argues that Otey's testimony is corroborated by the following:

1. Justin Taylor described Otey's vehicle and the route taken during the kidnapping;

2. Detective Kenneth Austion found Otey in possession of stereo equipment stolen during the robbery;

3. Dick Stovall, a security manager and custodian of records at Wal-Mart, testified that, on May 21, 2003 at 4:56 p.m., a pellet gun with a laser was purchased; and

4. Anthony Guinyard, an employee of the Kraft Street business, stated that the Defendant was present in the store with rims for resale.

From consideration of the proof in the record before us, we find the evidence insufficient to corroborate the testimony of the accomplice Travis Otey. As in Boxley, none of this evidence relates

to the identity of the Defendant.  See id.  "It is not enough to simply corroborate that a crime has been committed in a manner described by the accomplice[]."  Id. (citing Shaw, 37 S.W.3d at 903).  "The corroborative evidence must of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime."  Griffis, 964 S.W.2d at 588.  The record is devoid of any independent evidence connecting the Defendant to Otey's Oldsmobile Cutlass, the crime scene or the surrounding area, the weapon, the mask, or the stolen car or items.  See Boxley, 76 S.W.3d at 387.

The only testimony arguably relating to the identity of the Defendant is Mr. Guinyard's testimony that the Defendant brought rims to the Kraft Street business to sell.  However, Mr. Guinyard could not give a description of the rims; in fact, Mr. Guinyard never observed the rims.  Mr. Guinyard could not recall when this occurred, only that it had been about two and one-half years prior to the trial.  Guinyard's testimony only connected the Defendant with a set of rims, not the *stolen* rims.  Because rims are mass-marketed items, possession of rims alone is not sufficient evidence to connect the Defendant with the crime in question.  Accordingly, we are unable to conclude that this evidence is sufficient corroboration that the Defendant participated in the crimes.  The evidence is insufficient to support the guilty verdicts.

## CONCLUSION

Based upon our review of the record, we are unable to find corroboration of the testimony of the accomplice.  Accordingly, the judgments of conviction are reversed, and the case is dismissed.

_____
DAVID H. WELLES, JUDGE

-7-