IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 21, 2018

## NARRELL PIERCE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1707     Steve R. Dozier, Judge**

_____

**No. M2017-01268-CCA-R3-PC**

_____

The Petitioner, Narrell Pierce, filed for post-conviction relief from his convictions of attempted aggravated robbery, attempted second degree murder, employment of a firearm during the commission of a dangerous felony, and unlawful possession of a handgun by a felon.  The Petitioner alleged that his trial counsel was ineffective by (1) failing to challenge the sufficiency of the evidence supporting his attempted aggravated robbery conviction, (2) failing to object to his co-defendant's testimony, (3) depriving the Petitioner of his constitutional right to testify, and (4) failing to present a ballistics expert. After a hearing, the post-conviction court denied relief, and the Petitioner appeals.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and CAMILLE R. MCMULLEN, JJ., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the Appellant, Narrell Pierce.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Glenn R. Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### I.  Factual Background

The Petitioner was charged with attempted aggravated robbery, especially aggravated kidnapping, attempted first degree murder, employing a firearm during the commission of or attempt to commit a dangerous felony, possession of a handgun by a

convicted felon, and theft of property based on his role in a shooting that occurred at the Lewis Street Market in Nashville. State v. Narrell Christopher Pierce, No. M2014-00120-CCA-R3-CD, 2015 WL 2102003, at *1 (Tenn. Crim. App. at Nashville, May 5, 2015). Following a motion filed by the State prior to trial, the trial court dismissed the especially aggravated kidnapping charge and the theft of property charge. Id.

On direct appeal, this court summarized the facts as follows:

> At the suppression hearings, . . . Anthony Wilfert testified that in March 2011, he was a detective with the Metropolitan Nashville Police Department ("NPD"). On March 15, 2011, he responded to a report of a robbery and shootout at the Lewis Street Market. Detective Wilfert met with the victim, Kamil Alakabi, who described the two suspects as African American males. Detective Wilfert also viewed the Lewis Street Market's surveillance video and located shell casings throughout the building.
>
> During his investigation, Detective Wilfert developed the [Petitioner] as a possible suspect and compiled a photographic lineup that included the [Petitioner]. . . . The victim looked at the lineup for several minutes, . . . then identified photograph number 3, which depicted the [Petitioner], and stated, "Number 3 looks like him; all others don't resemble him." Detective Wilfert told the victim that he needed to be "100 percent sure" that he identified the correct person, and the victim responded, "That's him, none of the others were him."
>
> . . . .
>
> Kamil Alakabi, the owner and operator of Lewis Street Market, testified that on March 15, 2011, two men attempted to rob his store at gunpoint. The victim recalled that at approximately 9:00 p.m. that evening, he was organizing the shelves in his store with one of his employees when two men, later determined to be the [Petitioner] and Travis Bowman, entered the store. They walked directly towards the victim, and the [Petitioner] put a gun in his face. The victim grabbed the gun, and the [Petitioner] punched him and knocked him to the ground. The two men then approached the other employee, and the victim retrieved his own gun. The

[Petitioner] fired several shots at the victim, and the victim returned fire. The two men then ran out of the store and fled the scene. The victim immediately called the police to report the incident. He described the suspects and viewed the surveillance video with the responding officers.

The victim recalled being shown a photographic lineup by police and identifying the [Petitioner] as the gunman. He said that he told Detective Wilfert that he was "50 percent sure that's him." . . . The victim attended a subsequent court hearing and identified the [Petitioner] as the man who shot at him and attempted to rob him. He again identified the [Petitioner] as the perpetrator during the suppression hearing.

On cross-examination, the victim agreed that he had never seen the [Petitioner] prior to the robbery. He also agreed that the gunman wore sunglasses and a hat, making it harder to see him, and that the gunman pulled out his gun very quickly and surprised the victim. He recalled that the entire incident happened very quickly and was over within one or two minutes. The victim reiterated that he told Detective Wilfert he was "50 percent certain" that the photograph he selected depicted the gunman. He agreed that seeing the surveillance video and subsequent photographs made him more certain that he had selected the man who shot at him.

. . . .

The victim's testimony at trial was largely consistent with his testimony at the suppression hearing. He clarified that after being knocked to the ground by the [Petitioner], the [Petitioner] and Mr. Bowman approached the victim's employee and held a gun to his face. While the perpetrators focused their attention on the other employee, the victim retrieved a nine millimeter handgun from his pocket. Before he could fire any shots, however, the magazine fell out of his gun, and the [Petitioner] began firing his own weapon at the victim. The victim retrieved the magazine and returned fire. The [Petitioner] then continued to shoot at the victim while he and Mr. Bowman fled the store. After the perpetrators fled the store, the victim called 911. Police responded to the

scene, interviewed the victim, and collected evidence at the store. During their investigation of the scene, officers collected one 40–caliber cartridge case. Two more 40–caliber shells were later discovered by the victim and collected by NPD officers. The victim also provided police with the surveillance video that captured the incident and turned over his gun for analysis. Several days after the shooting, the victim identified the [Petitioner] in a photographic lineup as the gunman who attempted to rob his store.

Detective Wilfert's testimony was likewise consistent with his testimony at the suppression hearing. As the lead detective assigned to the case, he met with the responding officers and interviewed the victims. The police department's surveillance unit retrieved the surveillance video from the victim's store and released it to local news stations. Several days later, Detective Wilfert received a tip that led him to develop the [Petitioner] as a suspect. He compiled a photographic lineup and showed it to the victim, who identified the [Petitioner] as the gunman. Detective Wilfert obtained an arrest warrant for the [Petitioner], and the [Petitioner] was arrested the following day, March 18, 2011, at his mother's residence as he exited his vehicle. Inside of the vehicle, police discovered a handgun under the driver's seat. A fingerprint lifted from the gun matched the [Petitioner], and forensic analysis by the Tennessee Bureau of Investigation revealed that this handgun fired the .40 caliber casings recovered from the Lewis Street Market.

After the [Petitioner]'s arrest, police seized the [Petitioner's] vehicle and cellular phone, and Detective Wilfert obtained a search warrant for both pieces of property. Upon searching the [Petitioner]'s car, police officers discovered a blue baseball cap, two pairs of sunglasses, and a magazine for a Glock .40 caliber pistol. A series of text messages were recovered from the [Petitioner]'s cellular phone and read into evidence. These messages discussed the [Petitioner] taking a "major loss" on his money and having a "near-death" experience as a result of a "shootout."

Travis Bowman, the [Petitioner]'s cousin, testified that he was the other individual that entered the Lewis Street

Market with the [Petitioner] on March 15, 2011. Earlier that evening, they met two other men at an apartment complex in east Nashville, and all four left together in a white Pontiac. Mr. Bowman recalled that during the car ride, the [Petitioner] and the driver of the Pontiac discussed "some money" and said they "needed money." Mr. Bowman claimed, however, that he did not know the [Petitioner] intended to rob the Lewis Street Market. The driver pulled into Lewis Street Market, and the [Petitioner] exited the car and walked towards the store. While looking for his money clip, Mr. Bowman found a handgun on the floorboard of the car and asked the other two passengers whether they had dropped anything. The driver told Mr. Bowman, "[N]o, that's for you. . . . [Y]ou need to get out and help your cousin."

Mr. Bowman exited the vehicle and told the [Petitioner] to "let this go," but the [Petitioner] responded, "I got this," and entered the store. Mr. Bowman followed the [Petitioner] into the store. The [Petitioner] approached the owner and "wrestled [him] to the ground, pulled out the gun, and hit him a few times." As the [Petitioner] approached a second employee in the store, the owner retrieved a gun and "shots began." Mr. Bowman testified that the [Petitioner] shot his weapon first, and the owner returned fire. Mr. Bowman did not fire his gun in the store. The [Petitioner] and Mr. Bowman fled the store and left the scene in the white Pontiac. Mr. Bowman put the gun back on the floorboard of the car and was dropped off at his home. The [Petitioner] told him to "lay low, . . . don't say anything, . . . everything will be alright." Several days later, Mr. Bowman was contacted by police regarding his involvement in the incident.

On cross-examination, Mr. Bowman acknowledged that he had been indicted on a number of counts related to the attempted robbery and, if convicted, would face a lengthy prison sentence. He agreed that he hoped his cooperation with authorities would help him receive a better sentence but denied that he had received any promises in exchange for his testimony. He conceded that after the attempted robbery, he did not contact the police and lied to his family about his involvement. He maintained that he did not know the [Petitioner] intended to rob Lewis Street Market until they

pulled into the parking lot and agreed that the [Petitioner] never talked about hurting anyone prior to entering the store.

The State also introduced into evidence recorded phone calls that the [Petitioner] made from the county jail and played them for the jury.

Id. at *2-5 (footnotes omitted).

The Petitioner filed a timely pro se petition for post-conviction relief, counsel was appointed, and an amended petition was filed. The Petitioner alleged, in pertinent part,[1] that trial counsel was ineffective by (1) failing to challenge the sufficiency of the evidence supporting his attempted aggravated robbery conviction in the motion for new trial; (2) failing to object when co-defendant Bowman testified that a robbery probably would have occurred if the shooting had not begun; (3) depriving the Petitioner of his constitutional right to testify at trial by advising the Petitioner that counsel would not allow the Petitioner to testify untruthfully; and (4) failing to present a ballistics expert to corroborate the Petitioner's contention that he did not aim at the owner of the store but fired his gun at random to escape.

At the post-conviction hearing, the Petitioner testified that trial counsel began representing him in general sessions court and continued to represent him throughout his trial and direct appeal. The Petitioner said that he was confined in prison in Hardeman County prior to trial. Trial counsel did not visit the Petitioner in prison; nevertheless, they had sufficient communication about the case.

The Petitioner asserted that when he entered the store, he did not demand money from the owner or the employee; accordingly, the State did not adduce proof of a robbery. The Petitioner acknowledged Bowman's testimony that if the shooting had not started, a robbery probably would have occurred; however, the Petitioner argued that counsel should have objected to Bowman's testimony because it was inconsistent with his earlier testimony and because it was speculative. The Petitioner also complained that trial counsel failed to challenge the sufficiency of the evidence supporting the attempted aggravated robbery conviction in the motion for new trial, which failed to preserve the issue for appeal.

The Petitioner said that he and trial counsel discussed the events at the store "to come up with a scenario" but that trial counsel refused to "put any scenario in there."

_____

[1] The Petitioner raised additional issues in the petitions that have been abandoned on appeal. We have limited our summary of the facts adduced at the post-conviction hearing to those pertinent to the Petitioner's appellate issues.

- 6 -

Trial counsel advised that he did not want the Petitioner to testify if the Petitioner intended to lie. Trial counsel further advised that if the Petitioner chose to testify untruthfully, trial counsel would not ask the Petitioner questions while he was on the stand, and the jury would know the Petitioner was lying. The Petitioner said that trial counsel could not have known whether the Petitioner was lying because the Petitioner never told trial counsel his version of events. The Petitioner insisted that he wanted to testify in order to tell the jury that he "wasn't trying to kill nobody." He acknowledged, however, that he was convicted of the lesser-included offense of attempted second degree murder. The Petitioner noted that trial counsel told him the State could use his aggravated robbery convictions to impeach his credibility if he testified.

The Petitioner complained that trial counsel did not do any investigation of the ballistics, noting that one bullet the Petitioner fired did not land near the owner, which showed the Petitioner was not shooting at the owner. The Petitioner maintained that he fired three shots just to get out of the store.

On cross-examination, the Petitioner said that he was incarcerated prior to trial because he violated his probation on four robbery convictions and three attempted robbery convictions. Before trial, the Petitioner and trial counsel "had two big arguments" about how the case would proceed and trial counsel's failure to prepare the Petitioner to testify. Therefore, the Petitioner chose to represent himself during part of voir dire; however, before voir dire ended, the Petitioner decided to have trial counsel represent him.

The State repeatedly asked the Petitioner what his trial testimony would have been, but the Petitioner was reluctant to reveal his prospective trial testimony. He eventually stated that before entering the store, he thought only one person was inside, but, after entering the store, he discovered two people were inside. Upon being pressed for further details, the Petitioner responded, "That it is [sic] whole thing I just said, we never prepared to [sic] what I was going to say. . . . We never prepared it."

The Petitioner hesitated to give further details about the day of the offense, explaining that he should discuss the issue with his lawyer because he did not want to compromise his "5th Amendment right[s]" in the event he was granted a new trial. However, after the post-conviction court advised the Petitioner that it would not be able to evaluate whether the Petitioner suffered prejudice if he refused to reveal how he would have testified at trial, the Petitioner conceded that he entered the store to rob "an Iranian dude . . . for some dope" but maintained that he did not intend to rob the store. He said that he entered the store before Bowman, that he and Bowman had their guns out when they entered the store, and that the owner of the store was the first person to fire a gun. The Petitioner said, "[M]y main thing about testifying is because I was charged [with] attempted first-degree murder and I never tried to kill nobody."

The Petitioner acknowledged that Bowman testified that if shooting had not started, a robbery would have occurred. The Petitioner further acknowledged that Bowman testified that he overheard the Petitioner having a telephone conversation during the drive to the store, during which the Petitioner stated he needed money.

Trial counsel testified that he had been with the public defender's office for over twenty years and that he practiced only criminal law. He represented the Petitioner throughout trial and on direct appeal except for the brief time he served as "elbow counsel" while the Petitioner represented himself. Trial counsel asserted that he was prepared to try the Petitioner's case.

Trial counsel and the Petitioner discussed the charges, potential trial strategies, problems with the case, and the motions that could be filed. Trial counsel recalled that the State's proof was that the owner of the store had identified the Petitioner during a lineup; the police had a surveillance video of the crime; Bowman would testify against the Petitioner; the Petitioner had made incriminating telephone calls from jail; and a gun was found which matched ballistics from the scene.

Trial counsel explained that the defense had two trial strategies: (1) that the owner of the store's identification of the Petitioner was not certain and (2) that the State failed to adduce proof of an attempted premeditated first degree murder. Because the State's proof of identification was strong, trial counsel thought an "elements-type defense" was likely to be more successful. The Petitioner was more interested in establishing that he was not the perpetrator and that the State could not prove he was the person on the surveillance video or in the market. Trial counsel and the Petitioner discussed extensively that the Petitioner was the person on the surveillance video; nevertheless, trial counsel thought that he was not prohibited ethically from challenging the State's proof regarding the identity of the person on the video.

Trial counsel did not "think it was ever seriously discussed that [the Petitioner] would testify and claim that he was not the person in the video." Trial counsel explained that such testimony was different from challenging the State's proof of identity and would have been "fraudulently represent[ing] something to the [trial court]." Trial counsel acknowledged that the Petitioner had a constitutional right to testify. Regardless, trial counsel thought he could not ethically support the Petitioner's testimony denying he was the person on the video because both he and the Petitioner knew that testimony would not be truthful. In that event, trial counsel would have been constrained to either make a "noisy withdrawal" or to allow the Petitioner to testify in a narrative fashion without being asked questions. The Petitioner readily accepted trial counsel's advice

against testifying. Trial counsel opined that the Petitioner understood the Momon[2] proceedings and knowingly and intelligently waived his right to testify.

On cross-examination, trial counsel said that the Petitioner received multiple plea offers from the State. The Petitioner was interested in settling the case, but the State never made an offer the Petitioner "could live with."

Trial counsel said that he probably advised the Petitioner that the State might use his prior aggravated robbery convictions to impeach his credibility if he testified but that he could not recall definitively whether he advised the Petitioner of that possibility. Trial counsel thought he filed a motion in limine to prevent the State from using the prior convictions for impeachment because they were too similar to the charged offenses.

Trial counsel conceded that he did not challenge the sufficiency of the evidence to support the attempted aggravated robbery conviction in the Petitioner's motion for new trial or on direct appeal but offered no specific explanation for his decision.

After the hearing, the post-conviction court filed an order denying relief. On appeal, the Petitioner challenges this ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See

---

[2] In Momon v. State, 18 S.W.3d 152, 161-62 (Tenn. 1999), our supreme court outlined procedural safeguards to ensure that a criminal defendant's constitutional right to testify at trial was knowingly, voluntarily, and intelligently waived on the record.

<u>Fields</u>, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. <u>Id.</u>

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." <u>Goad v. State</u>, 938 S.W.2d 363, 369 (Tenn. 1996) (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

<u>Goad</u>, 938 S.W.2d at 370 (citing <u>Strickland</u>, 466 U.S. at 697).

The Petitioner asserts that trial counsel should have challenged the sufficiency of the evidence because the State adduced no proof a robbery occurred. The Petitioner maintains that counsel "effectively waiv[ed] the issue for appeal." We note, however, that sufficiency of the evidence is "an issue which is not waived by the defendant's failure to raise it in his motion for new trial." <u>State v. Bowman</u>, 327 S.W.3d 69, 93 (Tenn. Crim. App. 2009) (citing <u>State v. Boxley</u>, 76 S.W.3d 381, 390 (Tenn. Crim. App. 2001); Tenn. R. App. P. 3(e)).

Moreover, the proof at trial revealed that Bowman heard the Petitioner discussing his need for money. Shortly thereafter, Bowman and the Petitioner met two other men, and the four men drove to the store. The Petitioner exited the car first, and, as Bowman felt on the floor of the car for his money clip, he felt a gun. The two men in the car urged Bowman to take the gun with him to help the Petitioner, saying that the Petitioner "has this [under control]." As they walked into the store, Bowman pled with the Petitioner to buy some chips and leave the store, but the Petitioner responded, "I got this," which Bowman interpreted to mean the Petitioner and the other men had formed a plan to "get some money" and "rob the store." The Petitioner entered the store and wrestled with the owner of the store. Eventually, the owner got his own gun, and the Petitioner fired the

first shot. The owner and the Petitioner exchanged gunfire as the Petitioner and Bowman ran outside and got in the car. We conclude that the State adduced sufficient proof to sustain the Petitioner's attempted aggravated robbery conviction; therefore, the Petitioner suffered no prejudice by trial counsel's failure to raise the issue on direct appeal. See State v. Tyler Young, No. W2013-01591-CCA-R3-CD, 2015 WL 513643, at *4 (Tenn. Crim. App. at Jackson, Feb. 6, 2015); State v. Kevin L. Buford, Sr., No. M2010-01618-CCA-R3-CD, 2012 WL 1895953, at *21 (Tenn. Crim. App. at Nashville, May 24, 2012).

In a related issue, the Petitioner contends that trial counsel should have objected to Bowman's testimony that a robbery probably would have occurred if shots had not been fired, which the Petitioner asserts was only speculation. We note that even without Bowman's challenged testimony, the proof adduced at trial clearly established that the Petitioner intended to rob the store. Accordingly, we conclude the Petitioner did not suffer any prejudice by trial counsel's failure to object. See Leonard Lebron Ross v. State, No. 03C01-9802-CR-00077, 1999 WL 357339, at *4 (Tenn. Crim. App. at Knoxville, June 4, 1999).

The Petitioner contends that trial counsel deprived him of his constitutional right to testify by advising the Petitioner that "he would not allow him to testify at trial because his answers would be lies." The Petitioner maintains that "[t]rial counsel was not ethically prohibited from allowing [the Petitioner] to testify in his defense even if those answers might make him feel uncomfortable." Initially, we note that the Tennessee Supreme Court's Rules of Professional Conduct provide in pertinent part:

> (b) A lawyer shall not offer evidence the lawyer knows to be false, except that a lawyer who represents a defendant in a criminal proceeding, and who has been denied permission to withdraw from the defendant's representation . . . may allow the client to testify by way of an undirected narrative or take such other action as is necessary to honor the defendant's constitutional rights in connection with the proceeding.

Tenn. Sup. Ct. R. 8, RPC 3.3(b). Trial counsel correctly advised the Petitioner that if he intended to offer false or fraudulent testimony, trial counsel ethically would be unable to question the Petitioner and would be constrained to have the Petitioner testify in a narrative fashion.

Moreover, the post-conviction court accredited trial counsel's testimony that he advised the Petitioner not to testify and that the State could impeach the Petitioner with his prior convictions. Trial counsel had a valid concern regarding an ethical issue if the Petitioner had chosen to testify completely contrary to his acknowledgment to trial counsel that the Petitioner was the person shown on the video. The Petitioner is not

- 11 -

entitled to relief on this basis.  <u>Scott Bradley Price v. State</u>, No. E2004-02718-CCA-R3-PC, 2005 WL 3479242, at *7 (Tenn. Crim. App. at Knoxville, Dec. 16, 2005).

Finally, the Petitioner contends that trial counsel was ineffective by failing to present a ballistics expert to corroborate the Petitioner's claim that he was not aiming at the victim but was firing his weapon at random in order to escape the store.  However, the Petitioner did not have a ballistics expert to testify at the post-conviction hearing. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."  <u>Black v. State</u>, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).  We may not speculate on what benefit this witness might have offered to the Petitioner's case, nor may we guess as to what evidence further investigation may have uncovered.  <u>Id.</u>  Accordingly, the Petitioner has failed to demonstrate prejudice in this regard.

### III.  Conclusion

In sum, we affirm the judgment of the post-conviction court and conclude that the Petitioner is not entitled to post-conviction relief.

_____
NORMA MCGEE OGLE, JUDGE