FILED

08/11/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 20, 2016 Session

## STATE OF TENNESSEE v. MARCUS GERGISH

**Appeal from the Criminal Court for Washington County**
**No. 38781     Lisa Rice, Judge**

_____

### No. E2016-00279-CCA-R3-CD

_____

Defendant, Marcus Gergish, was found guilty by a jury of one count of criminally negligent homicide and two counts of attempted aggravated robbery and was sentenced to serve an effective twenty-one-year sentence in the Department of Correction. In this appeal, Defendant argues: (1) that the evidence was insufficient to support his convictions; (2) that the prosecutor committed prosecutorial misconduct by destroying evidence; (3) that the prosecutor committed prosecutorial misconduct by misleading the jurors and misstating evidence; (4) that the trial court's denial of a motion to continue, motion for expert funding, and refusal to allow the defense to call a witness on Defendant's behalf denied Defendant a fair trial; (5) that the trial court failed to instruct the jury on the issues of dying declarations and lost or destroyed evidence; (6) that the trial court failed to act as the Thirteenth Juror; and (7) that the cumulative effect of all the errors denied Defendant a fair trial.  Following a careful review of the record, we find that Defendant's motion for new trial was not timely filed.  Therefore, all of Defendant's issues except for sufficiency of the evidence are waived, and we decline to exercise our discretion to review the waived issues for plain error.  Defendant's convictions are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and NORMA MCGEE OGLE, JJ., joined.

David L. Robbins, Johnson City, Tennessee, for the appellant, Marcus Gergish.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Anthony Wade Clark, District Attorney General; Erin D. McArdle and Justin Bradford Irick, Assistant District Attorneys General, for the appellee, State of Tennessee.

OPINION

*Background*

Officer Jeff Legault of the Johnson City Police Department testified that he was dispatched to a shooting at the Westgate Village Apartments around "midnight-ish" on the night of April 2-3, 2013. Officer Legault saw the victim, Timothy Peregoy, lying on the ground with a gunshot wound. The victim's wife, Dawna, and his two sons, Brandon and Timothy Peregoy, Jr. (Timbo), were also there. Officer Legault described the scene as "kind of in chaos, chaotic trying to - just screaming and hollering."

Officer Legault testified that the victim was still breathing, and he attempted to speak but Officer Legault said that the "victim was not saying anything of any relevance to me, and if he was, I wasn't understanding because other people were screaming at the same time."

Officer Legault spoke to the victim's sons who told him that they got into the car and were preparing to leave "when a couple of subjects came up and attempted to rob them, and then there's a short scuffle or fight or something and [the victim] got shot." The victim's sons also described the shooter as a white male wearing dark clothing. After the victim was shot, the suspects ran away, and the victim's sons pointed across the street in the direction in which they ran. Officer Legault was unable to get much information from the victim's wife because she was "very, very hysterical [.]"

Officer Legault, who was also a canine handler, used his dog, Rhino, to help track the shooter. Rhino was able to detect a scent in the area where the victim's sons had said that the shooter ran. At some point, Rhino lost the scent near the road. This indicated that "either there's a car there, someone possibly picked him up, in this case one of those two probably happened because there was nobody there at the end." Officer Legault later spoke with Investigator Whitlock and gave him all of the information.

R.G. (we will refer to the minor witness by her initials in order to protect her privacy) testified that she was 13 years old and had lived at the Westgate Apartments for approximately eight years. She knew the Peregoy family because she lived across the street from Timbo Peregoy and Karla Thacker, and she played with their son. R.G. testified that she had also seen the victim and Dawna Peregoy at the residence. R.G. testified that she had seen Defendant a couple of times when he came to the apartment complex to visit his brother.

On the night of April 3, 2013, R.G. was in her bedroom with her grandmother. Her window was slightly open, and she heard arguing and cursing, and the victim's wife said, "Leave us alone, leave us alone." R.G. said that the victim, Timbo Peregoy, and three other men were also there, and they were arguing and fighting. The three men were

wearing black hoodies, and she could not see their faces. She said that one of the men was a little taller, and one was short and skinnier. R.G. testified that the victim "was just arguing with them and he seemed like he was trying to get it like to just go away and backup because of his hand motions and stuff but I couldn't really make out what they were saying." One of the three men turned around and shot the victim. After the shooting, the three men ran away. One ran behind the building, and she did not remember where the other two ran. Karla Thacker ran back inside the house, and the victim's wife was screaming and said something about her head. R.G. said that they were running back and forth out of the apartment. RG saw "some" of the three men get into a car. Police then arrived on the scene.

On cross-examination, RG testified that she spoke with Investigator Whitlock and told him everything that she had seen. She agreed that she told Investigator Whitlock about a red car with a black stripe. R.G. testified that she heard Timbo Peregoy say the name "Adam," and she "[k]ind of" remembered him also saying, "Don't hit me, don't hit me, it was Adam []" during the argument with the three men. R.G. testified that Timbo Peregoy was standing near the victim when the shooting occurred. She saw Brandon Peregoy after the shooting. R.G. testified that she could not identify any of the three people wearing the hoodies. She did not see a gun but she heard it.

Brandon Peregoy, the victim's son, testified that at the time of the offenses in this case, he had been living at his brother Timbo's apartment with the victim and Dawna Peregoy. The three had been staying at Timbo Peregoy's apartment for approximately one week while the victim was recovering from surgery after having a heart attack, and their utilities had been cut off. They had planned to go back home that night. Karla Thacker and Ms. Thacker's and Timbo Peregoy's young son also lived in the apartment.

Brandon Peregoy testified that approximately 11:55 p.m. on April 2, 2013, there was a knock on the apartment door while everyone was eating dinner. Timbo Peregoy opened the door, and Defendant walked in. Defendant was wearing a red, white, and black shirt, and "he had a dark jacket on kind of black-ish, almost black, some dark pants." The jacket was a zip-up jacket with a hood. Defendant was also wearing a hat. Brandon Peregoy testified that Defendant asked Timbo Peregoy if he had any Suboxone, and Timbo told him that he did not have anything. Dawna Peregoy then retrieved some Suboxone from her wallet, and Timbo Peregoy gave it to Defendant. Brandon Peregoy noted that Defendant was "real frigid, kind of sweaty, nervous, trying to pace, just constantly moving." Defendant also said that he wanted the Suboxone because "he'd been out and he hadn't had any in a while, he'd been kind of sick." Brandon Peregoy testified that Defendant insisted "on trying to find something, any nature of what it was, and then my brother asked my dad trying to be confidential and tell him, no, don't say anything about it." The victim then said that "he had his Roxies and Opanas from that doctor visit prior [to] that day and he had them up in my grandmother's safe." The victim

- 3 -

did not offer to sell anything to Defendant. Brandon Peregoy thought that Defendant was in the apartment a total of five minutes, and he left with the Suboxone.

Brandon Peregoy testified that he, the victim, and Mrs. Peregoy left the apartment a few minutes later. He said:

> We just got our things, started on our way to the truck, we had noticed a couple of gentlemen like walking but they was a pretty good distance away from us. We got into the truck, my dad started it, and the next thing I know, these two guys was knocking at the window with a gun.

Brandon noted that there was one man at the driver's side window and one at the passenger window. The victim and Mrs. Peregoy both rolled their windows down, and the victim asked what was going on. The man at the driver's side window, whose voice he recognized as Defendant's, kept repeating, "Give me all your stuff." Brandon Peregoy testified that the man was "wearing a black hoodie zip-up, he had a hat on but it was turned around, a blue bandana on his face and he had dark pants and was kind of baggy, and white shoes." He was "pretty sure" that the man was holding a revolver, and he was the same size as Defendant. The man on the passenger side had a semi-automatic weapon. Both assailants were wearing gloves. The victim told the two men that he did not have anything. At that point, the man on the passenger side opened the door and attempted to pull the trigger on the weapon but it did not fire. Mrs. Peregoy began screaming for Timbo Peregoy, and the man began hitting Mrs. Peregoy with the gun. The victim then tried to force his way out of the vehicle. Brandon testified:

> My mom was screaming. My brother had then come out and started up the hill because he heard my mom screaming. The person on my dad's side pulled the gun on my brother and told him he might as well just get back in the house, and that's when my dad opened the door, grabbed his arm and shoved him back on the car next to us.
>
> *     *     *
>
> And he casually raised up and shot him once in the knee. My dad fell back hit the truck, and when he raised up again, he shot him again.

After the shooting, the three men ran "straight up to the laundromat and they started to curve between the buildings." Brandon Peregoy testified that he ran in the apartment and told Timbo Peregoy to call 9-1-1. He checked on the victim who was still breathing and talking. Brandon Peregoy testified that he began chasing the men but was unable to catch them.

When Brandon Peregoy got back to the scene, Timbo Peregoy had come back out of the apartment and gotten into the victim's vehicle. Brandon got into the vehicle with him, and they pulled out in an attempt to find the men. However, they were unable to locate them. Brandon Peregoy testified that he was ninety percent sure that the voice of the person who shot the victim was that of Defendant.

On cross-examination, Brandon Peregoy testified that the shooter's shirt was the same shirt that Defendant had worn in the apartment earlier that night. He also noticed part of a tattoo on the shooter's neck that looked like a flame. The shooter was also wearing a black hat with some writing on it. Brandon Peregoy admitted that he had told Investigator Whitlock that he thought his brother may have been involved in the shooting. This was based upon what other people were telling him at the time.

On redirect examination, Brandon Peregoy testified that he had mentioned Jeb Adam Clay as being one of the three assailants because "the gun on my father's side had resembled a gun" that Mr. Clay had brought to Timbo Peregoy's apartment to sell. He noted that Mr. Clay was a family friend, and Mr. Clay came to the hospital shortly after the victim was shot. Brandon Peregoy read into evidence his statement that was given to Detective Whitlock on April 3, 2013. In the statement Brandon Peregoy identified Defendant as the person who shot the victim, and he also stated that Defendant was wearing the same clothes that he wore to Timbo Peregoy's apartment five minutes earlier.

Karla Thacker testified that on the night of April 2-3, 2013, she was living on Nathaniel Drive at the Westgate Village Apartment Complex with Timbo Peregoy and their three-year-old son. At the time the victim, Dawna Peregoy, and Brandon Peregoy had been staying with them because the victim had had a heart attack and surgery, and their "utilities were off." They had planned to return home later that night. Ms. Thacker testified that while they were eating a late dinner, Defendant came to the apartment asking for Suboxone. She said that Timbo Peregoy told Defendant that he did not have anything, but Mrs. Peregoy said that she had a Suboxone strip in her wallet. Ms. Thacker testified that the victim "woke up off the couch for a second and told [Defendant] if he was still sick tomorrow that he would bring his roxies that he didn't have them on him." Ms. Thacker testified that Defendant was shaking and "acting weird" when he came to the apartment. She said that there was a discussion while Defendant was in the apartment that the victim, Mrs. Peregoy, and Brandon Peregoy would be leaving shortly. Defendant left the apartment after purchasing the Suboxone strip from Mrs. Peregoy.

Ms. Thacker testified that the victim, Mrs. Peregoy, and Brandon Peregoy left the apartment approximately five minutes later, and Ms. Thacker and Timbo Peregoy remained in the apartment with their son. Ms. Thacker testified that she "heard a commotion which was [Mrs. Peregoy] screaming." Timbo Peregoy ran out the door, and Ms. Thacker and her son ran out immediately behind him. She said:

> I made it to the front window in front of our apartment and Timbo made it up to a bush that's close to the steps out there and I said, "Gun." And as soon as I drew attention to us, the person standing on [the victim's] side, drew the gun towards Timbo.

Ms. Thacker could not see the passenger side of the truck from where she was standing. Timbo Peregoy ducked when he saw the gun, and Ms. Thacker turned around and heard two shots fired as she walked toward her son. She then ran inside the house with her son, and someone told her to call police. Ms. Thacker testified that she was so frantic that the dispatcher could not understand her, and she gave them someone else's phone number. She was running in and out of the apartment during the call. She eventually gave the phone to Timbo Peregoy, and he talked to the dispatcher.

Ms. Thacker positively identified Defendant as the person who came to her apartment asking for Suboxone. She gave a statement to police on April 3, 2013. In the statement Ms. Thacker said that Defendant was wearing "a hat backwards, a black hoodie and he had a tattoo on the left side of his neck. He had black hair." She also said in the statement that Timbo Peregoy told her that Defendant was the brother of Josh Gergish who also lived on Nathaniel Drive. At trial, Ms. Thacker testified that she saw a black Honda car parked in front of the apartment when Defendant first came inside. She had seen the headlights of the car when Defendant arrived at the apartment, and she saw the headlights disappear when Defendant left. She also saw the black Honda leaving the scene after the shooting.

On cross-examination, Ms. Thacker testified that Jed Adam Clay stopped by their apartment a couple of days earlier. She explained that Mr. Clay was a good friend of the Peregoy family. Ms. Thacker said that Mr. Clay had stopped by the apartment to visit and sell some guns. She saw one of the guns, and she thought that it was a black semi-automatic weapon. Ms. Thacker agreed that Mr. Clay's name was mentioned by Brandon Peregoy on the night of the shooting. However, Ms. Thacker did not feel that Mr. Clay would be involved in the shooting.

Rachel Peters testified that at approximately 3:00 to 4:00 p.m. on April 3, 2013, she and her boyfriend Junior were in Johnson City and stopped to visit his friend "Paul." Ms. Peters testified that Paul's two children were also there, and Paul introduced her to Defendant. She said that Paul, Junior, and Defendant were talking in the living room, and she went to a back bedroom to play with the children. Ms. Peters testified that at some point, the men asked her to get them some beer while they went on the front porch to smoke a cigarette. As she was going to use the restroom, Ms. Peters noticed "cars outside, the Charger and stuff." Ms. Peters testified:

> . . . We could tell it was like police cars, and I even made the statement that there was, you know, something going outside because I

- 6 -

could see a lot of vehicles parked along the outside of the house or on the street, and we all came inside. That's when they had wanted me to get the beer and I said, "The police are outside," and I said, "Something's going on." I said, "I wonder what it is." [Defendant] made the reply, he just said, "They're probably here for me." So then everybody started communicating, you know, saying, "Why would they be here?" He didn't respond and they asked him to go on out front because we had kids in the house.

Ms. Peters testified that Defendant was acting nervous, and he began pacing. He also asked to leave out the window, and everyone said, "no" because the residence was surrounded, and they were concerned about the children.

Ms. Peters testified that she decided to go out the door to see what was going on. The police immediately told her to "Freeze" and to put her hands up. Ms. Peters complied, and they instructed her to walk backwards to them. The officers grabbed her and asked if there was someone named "Marcus" in the house. Mrs. Peters could not remember Defendant's name so she told the officers that there was a "guy" in the house. The officers asked if the "guy" had a tattoo on his neck, and she replied, "Yes." The officers said, "That's Marcus then." Mrs. Peters then sent a text to Junior asking him to tell Defendant to come outside because they did not want the officers to storm in the residence and scare the children. Mrs. Peters "guessed" that Junior and Paul convinced Defendant to go outside, and Defendant walked out the front door, and police grabbed him. Junior and Paul then walked out of the house with the children. Ms. Peters later gave a statement to police.

Investigator Thomas Garrison of the Johnson City Police Department testified that he obtained a mobile phone number for Defendant and completed an "Exigent Circumstances Request Form" to obtain information from T-Mobile on "location updates" for the number. He eventually received information that the location of the headset was at a house at the corner of Earl Street and Millard Street. Investigator Garrison and other officers surrounded the house, and Investigator Garrison called Defendant's cell phone. It rang but Investigator Garrison did not get an answer. He then sent a text message to Defendant's phone that read, "This is the police department, we have you surrounded. Come out with your hands up." Investigator Garrison did not get a response so he tried to call the phone again but it had been turned off. One of the sergeants on the scene "got on a PA system from one of the patrol cars and began to make announcements asking people in the house to come out with your hands up." A female then walked out of the house. She was ordered to turn around, put her hands up, and walk backwards to one of the detectives on the scene. The female indicated that someone named "Marcus" who had tattoos on his neck was inside the house. Defendant eventually walked out of the house with his hands in the air, but he initially would not follow any of the officers' directions. Defendant eventually complied with commands to

lie on the ground, and he was taken into custody. Investigator Garrison testified that the text message he sent earlier to Defendant's cell phone number was on the phone found in Defendant's pocket.

Dawna Peregoy, the victim's wife, testified that she and the victim were married for thirty years, and Timbo and Brandon Peregoy are their sons. Mrs. Peregoy testified that she, the victim, and Brandon Peregoy had picked up pizza on the night of April 2, 2013, and they arrived at Timbo Peregoy's apartment at approximately 11:00 p.m. She noted that they had been living at Timbo's apartment for the past week and that they planned to return to their house in Kingsport that night.

While everyone was eating pizza, Defendant knocked on the door "a little bit before 12:00," and Timbo let him inside. Mrs. Peregoy testified that Defendant asked for Suboxone, and Timbo Peregoy indicated that he did not have any. Mrs. Peregoy then took a "little piece" of Suboxone out of her wallet, and Timbo gave it to Defendant in exchange for $10.00 which Timbo gave to Mrs. Peregoy. She said that someone mentioned something about roxies, and the victim said, "I don't have nothing on me," . . . "it's all locked up in my mom's safe." Mrs. Peregoy testified that the victim indicated that all he had left were some "opanas," and if Defendant still "needed something the next day, he would be more than happy to give [Defendant] one."

Mrs. Peregoy testified that Defendant left, and she, the victim, and Brandon Peregoy packed all of their belongings and walked out of the apartment approximately fifteen to twenty minutes later. She saw two men wearing hoodies walking through the parking lot. Mrs. Peregoy said that after they got into their vehicle and were backing out, "both doors are yanked open and a gun is put in my head and one to [the victim's] head." Mrs. Peregoy testified that the man on her side of the vehicle said, "Give it up." She thought that his voice sounded African American. She told the man that she did not have anything, and he began hitting her on the head with the gun. Mrs. Peregoy could not tell anything about the man because he was beating her so badly. She heard the victim say, "Please stop hitting my wife," and the victim grabbed someone's arm. Mrs. Peregoy testified that she began screaming for Timbo Peregoy, and he came out of the apartment. Mrs. Peregoy saw Timbo running toward them, and then he dove into a bush when someone pointed a gun at him.

Mrs. Peregoy testified that she kicked her assailant in the "private parts," and she ducked in between two cars. She called 9-1-1 and told the operator that "we was being robbed and I'd been beat and then I heard the shots." Mrs. Peregoy then saw the victim slumped over their vehicle. She said that both of the assailants were wearing black hoodies, and she did not see their faces.

Timbo Peregoy testified that Defendant showed up at his apartment on the night of April 2, 2013, wearing a hoodie over his head. When Timbo Peregoy realized that it was

Defendant, he let him into the apartment. He said that Defendant was normally "laid back" but he seemed nervous and shaky when he came into the apartment. Defendant asked Timbo Peregoy for Suboxone, and Timbo responded that he did not have any. Defendant then said that he needed one "real bad," and he persisted in asking for it. Timbo Peregoy explained that he had met Defendant a couple of times and that they had "exchanged some drugs back and forth." He was more familiar with Defendant's brother, Josh, who lived in the same apartment complex. Dawna Peregoy overheard Defendant ask for the Suboxone, and she gave him a half of a strip in exchange for ten dollars. Timbo testified that at one point while Defendant was there, he followed Timbo back to the bedroom which Timbo found to be odd behavior.

Timbo Peregoy testified that the victim woke up while Defendant was in the apartment and told Defendant that if he had not found any drugs, and he was still sick the following day, the victim would give Defendant some of his pain medication. Timbo Peregoy testified that Defendant asked about crack cocaine as he was leaving the apartment. Timbo told Defendant that he did not have anything like that and that "we were going to bed and my mom and dad were about to leave, so it was time to go." Timbo Peregoy testified that he shut the door and locked it, and he looked out the window and saw a black Honda back out and drive toward Josh Gergish's apartment. Timbo testified that the victim, Mrs. Peregoy, and Brandon Peregoy left the apartment, and Timbo shut the door. He got a piece of pizza and was talking to Ms. Thacker when he heard the victim's truck start, and they saw the headlights in the window. Timbo Peregoy heard Mrs. Peregoy screaming a few seconds later. He ran out the door and up to the parking lot. Timbo Peregoy testified: "When I got to the top of the hill, [Defendant] said, 'Step back,' and pointed the gun at me, which he had a bandana on his face and a black hoodie, white T-shirt, ball cap with red around it." Timbo testified that he recognized Defendant's clothing.

Timbo Peregoy testified that the victim told the person on the other side of the truck to stop beating Mrs. Peregoy. He said that the victim began wrestling with Defendant over the gun, and Defendant said, "Give it up, man, just give me your shit." The victim responded that he did not have anything. Timbo Peregoy testified that when Defendant pointed the gun at him, he realized that his son and Ms. Thacker were outside. He said that he rolled "back behind a bush to get some kind of cover so they can't see and shoot me, and get my son and fiancé back inside because I didn't know if they was going to start pulling the trigger or what." Timbo Peregoy testified that he started toward the apartment with Ms. Thacker and their son when he heard "gunshots so close together it sounded like one[.]" He then "shoved" Ms. Thacker in the apartment and told her to call 9-1-1. Timbo Peregoy ran back to the parking lot and saw the victim who was bleeding. He saw Brandon Peregoy and two other individuals running toward the laundromat and in the same direction as Josh Gergish's apartment. Timbo Peregoy helped the victim to the sidewalk, and he got into the victim's truck and drove toward the laundromat. He picked up Brandon Peregoy, and they drove around looking for the assailants. Timbo

- 9 -

Peregoy testified that he and Brandon Peregoy did not find anyone, and they drove back to the victim. Timbo asked Ms. Thacker to call 9-1-1 again. He described the scene as "chaos." Timbo Peregoy testified: "I asked [the victim], I said, 'Do you know who it was?' He tried to say it and I said, 'Who, was it the person that was just at my house?' he said, 'Yes.'" Timbo testified that he spoke with Investigator Whitlock at the scene and briefly at the hospital. He said that he went out looking for Defendant after the victim was pronounced dead.

Timbo Peregoy testified that he texted Defendant and attempted to call him. Defendant finally answered the phone. Timbo Peregoy testified:

> I told him the cops were looking for him, that he needed to go talk, you know, that they was - - I know he shot my dad. I know it was him. He tried reassuring me that it wasn't him, and I told him, I said, "I know it was you, man." He said, "Man, I've got warrants, I can't talk to the law." I said, "Well, you're going to have a murder warrant on you if you don't go talk to them."

Concerning his conversation with Defendant, Timbo Peregoy testified:

> I told him that I'd talked with the investigator and I had, you know, I told them that he had been at my house and had purchased Suboxone and I told them everything, you know. I told them that it was [Defendant] on my dad's side of the truck and I told him, you know, that they was looking for him and I was too.

Timbo Peregoy testified that he talked to Defendant the following morning while Timbo Peregoy was at the police station and said, "Hey, I told him that it's you that done this and you need to talk with the police." He gave Defendant's phone number to one of the investigators. Timbo Peregoy thought that Defendant responded to one or two of the many texts that Timbo sent to him.

Timbo Peregoy testified that he gave a statement to Investigator Whitlock at approximately 11:00 a.m. on April 3, 2013. His statement read in part:

> We saw my parents stopped with the doors open. We ran out the door and straight towards their truck. I started through the yard and up the hill and that's when I saw [Defendant] standing in the door of my dad's Blazer, but I call it a truck. I know it was [Defendant] because he had on the same clothes he just left my apartment in. He pointed a gun at me and Karla and we stopped still. He pointed the gun back at my dad and said, 'Give it up, just give it up.' I recognized [Defendant's] voice. He had a black or dark blue bandana over his face with his hood up over his

- 10 -

head but I knew it was him. I saw my dad struggle and I could hear my mom still screaming. That was the first time I noticed a second person. He also had a black hoodie and his face was covered. When I looked at the second guy, he started around the truck to my dad's side. Then I heard two gunshots. I pushed Karla back and told her to call the law. She grabbed our son and ran back into the apartment. [Defendant] and the other guy took off running with my brother chasing after them. I seen my dad was bleeding from the mouth and struggling to breathe. My mom was holding him and trying to get him on the ground. Karla came back out and was helping my mom. I jumped in my dad's truck and took off in the direction where [Defendant] was running. I got around the corner and met my brother. He had lost them. He jumped in the truck and we went back to my dad. Dad was sitting on the curb trying to talk and breathe. I asked dad if he knew that it was the same guy who had just left the house, that it was [Defendant]. He was unable to talk and just nodded his head and struggled to breathe. Dad died while I was holding him.

On cross-examination, Timbo Peregoy thought that Defendant first arrived at his apartment between 11:15 to 11:20 p.m. on April 2, 2013. He thought that Defendant was there approximately fifteen to twenty minutes. Timbo Peregoy testified that the victim had "roxy" pain pills at the time but they were not with him in the apartment. The victim usually stored them at his mother's house. Timbo Peregoy testified that the victim, Mrs. Peregoy, and Brandon Peregoy left his apartment somewhere between 11:45 and 11:50. He thought that Defendant had a semi-automatic weapon. At the preliminary hearing, he testified that it was a 40-caliber weapon. Timbo Peregoy testified that Defendant's hat was turned forward when he was in the apartment, and it was turned backward as Defendant ran from the scene.

Timbo Peregoy testified that Brandon Peregoy mentioned a family friend named Jeb Adam Clay who had a tattoo similar to Defendant's, "but Adam's has a name and it's not, you know." Mr. Clay had physical characteristics similar to Defendant. He had also been to Timbo Peregoy's house earlier that week after being released from jail. Mr. Clay came to the apartment on one occasion trying to sell two guns, one of which was a semi-automatic handgun. Timbo Peregoy said that Mr. Clay was with him "just about the whole time from the hospital on. That's who I was riding with looking for [Defendant]." Timbo Peregoy testified that he met with Investigator Whitlock on May 16, 2013, and told him that he thought Defendant accidentally shot the victim. He testified:

I don't believe [Defendant] was the one that shot my dad. I believe the person that was on the passenger side is the one that pulled the trigger, but that don't mean [Defendant] wasn't there on my dad's side getting detained by my father and then my father gets shot in the knee. When

- 11 -

the person came around the truck, my father was shot in the knee. I didn't see this, but after, you know, he was shot in the knee and it shot through the arm, I mean, unless the gun went off accidently while they were fighting over it and he was pulling it out and he shot him through the shoulder, I mean, I don't know from that point. I know that there was a struggle for the gun and that they [sic] were two gunshots and it sounded like one so I think, I mean, I think someone – the person on the passenger side, which I didn't get a good look at, you know, I seen his back running away from me. I believe he come around and shot my dad to try to get him off [Defendant], and as [Defendant] was trying to pull away or something, the gun may have went off or scared [sic] when the gunshot went off to shoot my dad in the knee. He night have accidently pulled the trigger. I don't know, I just know . . .

On redirect examination, Timbo Peregoy testified that he was "one hundred (100%) percent sure that Defendant was the person he saw outside committing the robbery.

Investigator Joey Whitlock of the Johnson City Police Department testified that Defendant was developed as a suspect in the victim's shooting. He said that Timbo Peregoy also named Defendant as a suspect in his statement, and Timbo gave him Defendant's cell phone number. Investigator Whitlock testified that the

> . . . one constant was Timbo [was] adamant that the man who had just previously been in his apartment buying the Suboxone was the man. He knew him from the neighborhood, knew who he was. That's the same man who had the – the only one he could identify out of the three people, that's the only one that was consistent over and over again. "That's who you need to look for. That's who you need to find."

Investigator Whitlock testified that he was able to corroborate Timbo Peregoy's statement through other witnesses. He said that R.G.'s description of the assailants and the "voice talking" was similar to that of the Peregoy family's description. Investigator Whitlock testified:

> [R.G.] described the three figures from the distance that she was, all pretty much in dark clothing, all with the dark hoodies, but as far as identifying facial features, no, but identifying – corroborating what they say the apparel these men were wearing, she said the same thing.

R.G. agreed that the assailants were the same size as Defendant who she knew from being at the apartment complex.

- 12 -

On cross-examination, Investigator Whitlock testified that in addition to Jeb Adam Clays' name being mentioned at the scene by Brandon Peregoy, Josh Gergish and Chavez Hunter were also developed as suspects. Mr. Hunter was also charged in this case. Investigator Whitlock later spoke with Defendant's ex-wife, Kim Delfino, who said that Defendant was with her at the time of the shooting. Ms. Delfino told him that she and Defendant had been to Applebee's and then rented a room at the Red Roof Inn. She also produced a receipt from Applebee's. Investigator Whitlock testified that someone went to the Red Roof Inn and confirmed that the room had been rented. Ms. Delfino told him that she and Defendant went from "Applebee's to Westgate Village Apartments to a convenience store." Investigator Whitlock went to the convenience store to view a recorded security video. In the video, Ms. Delfino was seen coming into the store. Defendant was not on the video.

Investigator Whitlock acknowledged that at one point Timbo Peregoy indicated that he did not think Defendant actually shot the victim. Investigator Whitlock testified:

> [Timbo Peregoy] doesn't believe [Defendant] shot – he believed that when help from the passenger side, on Dawna's side came over there, [Defendant] was still [Defendant], he was still the man he locked eyes with, he never waivered from that. Timbo said, "You know how Marcus talks. You know what I'm saying about [Defendant's] voice" I said, "I have never to this day, I have never passed a word with [Defendant], never. Never heard him speak." Timbo said, and he would keep  - "That was his voice, those were his eyes, that was the man I," he never lost sight of that. The other two – and yes, he said and he tried to say that it could have been the guy from the passenger side that fired the shot once he got over to help [Defendant].

Investigator Whitlock mentioned that Brandon Peregoy at one point told him that Timbo Peregoy may have been involved in the shooting. Investigator Whitlock agreed that Brandon and Dawna Peregoy's stories had changed. However, he said that Timbo Peregoy's story was consistent. He said:

> It was always consistent that [Defendant], the man that he had just sold a Suboxone to, he never wavered from that. Timbo stated, "The man I did a hand to hand deal with with that Suboxone was the same man outside my apartment minutes later with the gun when my father was killed."

Sergeant Don Shepard of the Johnson City Police Department, Criminal Investigation Division, interviewed Defendant at approximately 9:20 p.m. on April 3, 2013. Defendant gave Sergeant Shepard the following statement:

- 13 -

> My name is Marcus Gergish. On April 2nd, me and my wife, Kimberly Delfino, went to Red Roof Inn and rent [sic] a room. We went to Applebee's to eat sometime around 11:00 or 12:00. We left there after being there maybe thirty minutes and went to Westgate. I went to a friend's house to try and buy a Suboxone. They didn't have one but told me Timbo might have one. I don't know him real good. It was the building next to the one I was at. I knocked on one door, it was the wrong one but they told me possibly the one across from that door. I knocked on it, they told me I had the wrong place. So I started to leave and there was a guy on the bottom of the upstairs stairs going up to the apartments and I asked him if he knew Tim. He said, 'I am Tim.' I said, 'Timbo?' he said, 'Yes, that door there,' which was the first one on the right. So I knocked, he answered. I asked if he had a Suboxone for sale, he said, 'No.' I asked if he could get one. He said he would try. Then a girl in the apartment handed him one – a strip in a cigarette cellophane. I asked him, 'How much?' He said, '$10.00.' I got it and told him if he could get any more to call me and I would buy him one and gave him my number. My wife, Kimberly Delfino, was in the car waiting on me the whole time I was there maybe fifteen minutes then we went to the motel room and drank a few beers then I called Donna, his sister . . . and asked if she could get one. She told me to come over. So we went. When we pulled in the entrance, we seen a lot of cops and went back to the room until about six o'clock. Then we went to her house. My wife and I drank another beer. We finally fell asleep and woke up about 8:00. And that – all I did that whole night. Then we got up and went back to the room to get our stuff, well, her stuff, and went to Walmart, got gas then to Bristol. Got a room at Days Inn about 4:30 p.m. We left because she had to go pick up her two girls so she dropped me off at my friend's and I was there maybe an hour and got a text from the police. They said for me to come out. I did and that's what happened.

Defendant never told Sergeant Shepard anything about phone calls to and from the Peregoy family, and he did not mention anything about stopping at a BP convenience store.

On cross-examination, Sergeant Shepard testified that he could not recall asking Defendant if he shot the victim or if the shooting was accidental.

Defense counsel recalled Timbo Peregoy as a witness. Timbo testified that he knew Michael Cox, and "[h]e's a friend of my best friend['s], girlfriend. He's her brother." Concerning the shooting, Timbo testified: "I told [Mr. Cox], and precisely told him, that I didn't believe [Defendant] was the one that shot my father. I didn't think he was the one that pulled the trigger but I knew it was him there for sure and that his face

was – had a bandana on it but that it was [Defendant]." Timbo Peregoy testified that he told Lisa Cox that he did not know the identity of the person who killed his father because that person's face was covered with a bandana. He said that he and Mr. Cox had gotten into an argument over the shooting because Mr. Cox is also a friend of Defendant.

On cross-examination, Timbo Peregoy testified that Defendant and Defendant's brother, Josh, would go to Mr. Cox's house and "party." He said that Lisa Cox is Mr. Cox's sister, and they have another brother. Timbo Peregoy testified that he no longer socializes with Mr. Cox but sees him occasionally at a mutual friend's house. He said that he told both Michael and Lisa Cox that he did not believe Defendant "had the balls to shoot my dad, and I didn't believe he was the trigger man, but that was him there."

Michael Cox testified that he is a friend of both Defendant and Timbo Peregoy. He said that Timbo Peregoy told him that he could not identify anyone involved in the shooting, including Defendant. Mr. Cox testified that he and Timbo Peregoy had discussed the subject between ten and twenty times.

On cross-examination, Mr. Cox testified that he and Defendant are friends, and they "hung out" together at Defendant's brother's residence. He never told police that Timbo Peregoy said he could not identify anyone involved in the shooting. On redirect, Mr. Cox testified that Timbo Peregoy first told him around the time of the victim's funeral that he could not identify anyone from the shooting. Timbo last told him that the day before Mr. Cox's trial testimony.

Lisa Cox testified that her boyfriend is Timbo Peregoy's best friend, and she has known him "[a]bout a year and a half[.]" She sees him a few times a month. Ms. Cox testified that Timbo Peregoy told her, "He just said that he couldn't absolutely identify who it was. He didn't see no faces of who it was. Basically, he didn't know exactly who done it." Ms. Cox thought Timbo had told her that close to twenty times. She was not sure when she first heard Timbo Peregoy make that statement, and he last made the statement "about a week ago" She said that Michael Cox and her boyfriend, Robert Hollifield, were present when Timbo Peregoy made the statement.

On cross-examination, Ms. Cox testified that she is a friend of Defendant, Josh Gergish, and Timbo Peregoy. She said that both Defendant and Josh Gergish had been to her house. Ms. Cox testified that she never told police that Timbo Peregoy said that he could not positively identity anyone involved in the shooting.

Kimberly Delfino testified that she and Defendant were married in November of 2011, and they divorced in August 2012. She and Defendant remained in contact with one another until after Defendant's arrest in this case. Ms. Delfino testified that Defendant contacted her on April 2, 2013, and they decided to meet that evening. She said that the purpose of the meeting was "just to kind of catch up, we hadn't talked in two

and a half weeks, three weeks, and we knew that he was in violation of his probation from previous charges, so we were kind of just wanting to talk because we knew that was probably the last time I was going to see him." Ms. Delfino testified that Defendant was on probation for identity theft, and Ms. Delfino was the victim of the theft. She said that Defendant had used her debit card without her permission and caused her bank account to become overdrawn.

Ms. Delfino testified that she and Defendant met at his mother's house on the evening of April 2, 2013, and they went to the Red Roof Inn in Johnson City. She said that they arrived at the hotel shortly after 9:00 p.m., and they left at approximately 10:45 p.m. They drove to Applebee's and ordered an appetizer and drinks. Ms. Delfino remembered drinking a "Margarita or a cranberry and vodka," and Defendant had a beer. She said that according to a receipt that she had, they left Applebee's after 11:38 p.m.

Ms. Delfino testified that she and Defendant drove to the Westgate Village Apartment Complex on Nathaniel Drive and parked in front of Timbo Peregoy's apartment building. She waited in the car while Defendant went to purchase some Suboxone. Ms. Delfino noted that she is a registered nurse, and she explained that Suboxone is a "maintenance therapy or replacement therapy" for someone who is addicted to opioids. Ms. Delfino testified that Defendant struggled with drug addiction. She said that Defendant initially went to the apartment building to the left of Timbo Peregoy's because someone named "Donna" or "Lisa" lived there. Defendant was gone for approximately five minutes, and Ms. Delfino saw him run down to Timbo Peregoy's building. She could not see if Defendant went into an apartment, however, he returned five minutes later, and they left. Ms. Delfino testified that they stopped at a BP convenience store on the way back to the Red Roof Inn for Ms. Delfino to use the restroom. Defendant did not walk inside the store. Ms. Delfino testified that she and Defendant arrived back at the Red Rood Inn "just a few minutes after midnight."

Ms. Delfino testified that she and Defendant had been at the Red Roof Inn for approximately thirty to forty-five minutes when Defendant received a call from someone who said "there was a rumor going around that someone had gotten shot at Clark Manor[.]" Ms. Delfino testified that she and Defendant drank a beer and talked, and they decided to drive back to the Westgate Village Apartments. She said,

> As soon as we pulled in there, the area where I'd previously been parked, my car had been parked, it had yellow ribbon or yellow rope and the police were all over the place so we just took a left and just left the neighborhood, we didn't know what was going on at the time.

Ms. Delfino testified that she and Defendant drove back to the Red Roof Inn, and Defendant received a telephone call from Timbo Peregoy. She said,

- 16 -

We were there just maybe five, ten minutes and then that's when [Defendant] had gotten – he'd gotten several, a couple phone calls at least, one I know that he got from Timbo and Timbo said that his – told [Defendant] that his dad got shot and he had told [Defendant] that he had told the investigators that he thought [Defendant] was the one who had done that, who had shot his father. I heard [Defendant] talk with him on the phone and explain to them, "I didn't shoot your father," you know, and he called me his wife still, "and me and wife, we just came over there and we left, and, you know, I didn't see anything, I had nothing to do with it." Shortly after that, I think he got a phone call from his brother saying that the cops had been to his house looking for [Defendant] at his brother's house.

Ms. Delfino testified that she and Defendant left the Red Roof Inn at approximately 3:00 to 3:30 a.m., and they arrived at her home in Piney Flats at approximately 3:30 to 4:00 a.m. Ms. Delfino testified that she and Defendant fell asleep at approximately 8:00 a.m. and woke back up at 10:00 a.m. They left the house before noon. Ms. Delfino testified that she and Defendant ran some errands and then decided to get a hotel room in Bristol because they "had just heard rumors of what was going on and we just decided to get a room in Bristol." They checked into the Days Inn hotel in Bristol at approximately 12:30 to 1:00 p.m. Ms. Delfino testified that they "dropped a couple of things off at the hotel and then drove back to Johnson City to pick up her daughters from school. She dropped Defendant off at a friend named Paul's house on Earl Street. Ms. Delfino testified that after picking her daughters up she began receiving calls from family members indicating that "[Defendant] was on the news and that they were charging him with murder or it was [on] the Internet somewhere in public media they seen it." Ms. Delfino was contacted later that evening by law enforcement, and she gave a statement. She said that she drove a blue 2010 Hyundai Elantra at the time that was confiscated by law enforcement on April 3, 2013.

On cross-examination, Ms. Delfino testified that she took Defendant back to the Westgate Village Apartments the second time to purchase crack cocaine from "Donna." Police were present when they arrived, and Ms. Delfino and Defendant had heard that there had been a shooting at the apartment complex. Ms. Delfino testified that the area where her car had been previously parked was "roped off with yellow tape and so we took a left and just got out of the neighborhood." Ms. Delfino recalled that she told Investigator Barron that when they saw police, Defendant told her to take a left and that he was "freaking out." Ms. Delfino testified that she and Defendant left the Red Roof Inn in the middle of the night because she could not sleep. She testified that Timbo Peregoy called Defendant at 1:00 or 1:30 a.m. on April 3, 2013, and accused him of being responsible for the victim's death. Ms. Delfino testified that neither she nor Defendant attempted to contact police to let them know that Defendant was not involved in the

shooting. She said that she and Defendant were both in "shock" and "disbelief" at the time.

Ms. Delfino agreed that she may have told Investigator Barron that she and Defendant drove back to Clark Manor at the Westgate Village Apartments to see what was going on rather than to buy crack cocaine. She further agreed that she told Investigator Barron that before she and Defendant returned to the apartment complex, Defendant had received several calls indicating that Defendant was involved in the shooting. Ms. Delfino testified that Defendant told Timbo Peregoy, "I'm sorry, but I had nothing to do with your dad's death." She did not recall if that is what she told Investigator Barron.

Investigator Michael Barron of the Johnson City Police Department was called as a rebuttal witness. He helped Investigator Whitlock in the present case. Investigator Barron interviewed Kimberly Delfino who did not want to give a formal statement to him. He said, "So it was basically a conversation between her and I and me taking notes on basically what she was telling me." Investigator Barron took notes during the interview.

Investigator Barron testified that Ms. Delfino told him that she and Defendant went to Westgate Village Apartments, specifically Clark Manor, at approximately 11:30 to 11:40 p.m. on April 2, 2013, to get a Suboxone strip. Ms. Delfino thought that Defendant was gone approximately five minutes and that he went to "possibly two different buildings." Ms. Delfino told Investigator Barron that she and Defendant left Westgate Village Apartments, Defendant drove to a BP convenience store, and Ms. Delfino went inside to use the restroom. Ms. Delfino told Investigator Barron that Defendant then wanted her to drive, and she drove them to the Red Roof Inn. Investigator Barron testified that Ms. Delfino told him that she and Defendant had been at the Red Roof Inn for approximately twenty to twenty-five minutes when a female called Defendant and said that someone had been shot and that Defendant "had done it." Ms. Delfino told Investigator Barron that she and Defendant drove back to Westgate Village approximately one hour later to "see what was going on there." She did not mention anything about buying crack cocaine. It was Investigator Barron's understanding that Defendant and Ms. Delfino knew about the shooting before returning to the apartment complex and that Defendant was identified as a suspect. Investigator Barron testified:

> She said that they saw the police there and that he had told her to take a left and was in her words, "freaking out." She said then after that he got several calls saying that he did this, one from a Timbo, whose father, Tim, was the one that was shot and who sold [Defendant] the Suboxone, and told him that he needed to come into the police department.

- 18 -

Ms. Delfino told Investigator Barron that she and Defendant went back to the motel and that Defendant received several more texts from Timbo Peregoy hours later and a call from Timbo who said that his father had died. She also said that Defendant apologized to Timbo Peregoy.

Michael Cox was also called as a rebuttal witness. Mr. Cox admitted that he had been convicted of five counts of felony forgery and theft.

*Analysis*

## I.      Failure to File a Timely Motion for New Trial and Notice of Appeal

Initially, we address the State's argument that Defendant's appeal should be dismissed because Defendant failed to file a timely motion for new trial which resulted in an untimely notice of appeal.

A motion for new trial "shall be made . . . within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). The time for filing a motion for new trial is mandatory and may not be extended. Tenn. R. Crim. P. 45(b); *State v. Johnson*, 980 S.W.2d 414, 418 (Tenn. Crim. App. 1998). "The thirty (30) day provision is jurisdictional, and an untimely motion is a nullity." *Id.* It deprives Appellant of the opportunity to argue on appeal any issues that should have been raised in the motion for new trial. *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997). Furthermore, the untimely filing of a motion for new trial does not toll the time for filing a notice of appeal; thus, an untimely motion for new trial will also result in an untimely notice of appeal. *See State v. Davis*, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987). Unlike the untimely filing of the notice of appeal, this court does not have the authority to waive the untimely filing of a motion for new trial. *See* Tenn. R. App. P. 4(a); *State v. Givhan*, 616 S.W.2d 612, 613 (Tenn. Crim. App. 1980). This court has previously held that pursuant to Rule 3(e) "the failure to file a motion for a new trial, the late filing of a motion for a new trial, and the failure to include an issue in a motion for a new trial results in waiver of all issues which, if found to be meritorious, would result in the granting of a new trial." *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994) (footnote omitted).

The judgments in this case were entered on February 20, 2015. Defendant did not file his motion for new trial until October 15, 2015, approximately six months after the time for filing had passed. We note that the trial court had entered an order captioned as an "Agreed Order" on September 16, 2015, citing a portion of the Post-Conviction Procedure Act, which contained the following:

> It appearing to the Court that a Motion for New Trial was not filed within thirty (30) days of the entry of judgment in this case. The Court finds it appropriate, pursuant to Tennessee Code Annotated [§]40-30-

- 19 -

113(3), to authorize a Motion to be made and disposed of by this Court as if the Motion had been filed under authority of Rule 59 of the Rules of Civil Procedure.

The order was not agreed to by the State. There is nothing in the record showing that Petitioner filed a post-conviction petition or that a hearing was held on any such petition. The trial court's reliance on T.C.A. § 40-30-113(3) was misplaced. The provisions of that statute are applicable only in a post-conviction proceeding. The trial court reviewed the motion for new trial despite the fact that it did not have jurisdiction to hear and determine the merits of the untimely motion. The trial court's "erroneous consideration [and] ruling on a motion for new trial not timely filed . . . does not validate the motion." *Martin*, 940 S.W.2d at 569 (citing *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). The trial court denied the untimely motion for new trial on January 19, 2016, and, because the motion for new trial was not timely filed, Defendant filed an untimely notice of appeal on February 8, 2016. Unlike the untimely filing of Defendant's motion for new trial, this court has authority to waive the untimely filing of Defendant's notice of appeal "in the interest of justice." This court previously entered an order waiving the timely filing of the notice of appeal. We will only address sufficiency of the evidence, which is an issue that does not need to be presented in a motion for new trial in order to be heard on appeal. *State v. Boxley*, 76 S.W.3d 381, 390 (Tenn. Crim. App. 2001). Moreover, we exercise our discretion and decline to conduct plain error review of the remaining issues Defendant raises in his brief.

## II.    Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to support his convictions. More specifically, he argues that his identity as the "perpetrator of the crime was not proven beyond a reasonable doubt," that Timbo Peregoy's testimony concerning the victim's "dying declaration is inherently incredible," and that he presented a valid alibi defense that was not disproven by the State.

When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The appellate court determines "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). Instead, this court affords the State the strongest legitimate view of the evidence contained in the record, as well as all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses

for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The conviction replaces the presumption of innocence with a presumption of guilt, and the accused has the burden of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

The identity of the perpetrator "is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010). Identity is a question of fact for the jury to determine after consideration of all the evidence. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

Defendant was convicted of criminally negligent homicide and two counts of attempted aggravated robbery. Criminally negligent homicide is criminally negligent conduct which results in death. T.C.A. § 39-13-212(a) (2006). The culpable mental state is defined as follows:

> "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

T.C.A. § 39-11-302(d). A person commits the offense of aggravated robbery by the "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and the theft is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. §§ 39-13-401, -402. The offense of criminal attempt is defined as follows:

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id.* § 39-12-101(a).


From a review of all the evidence, a reasonable juror could have found Defendant guilty of criminally negligent homicide and attempted aggravated robbery. In particular, it is undisputed that Defendant went to Timbo Peregoy's apartment on the night of April 2, 2013, in search of Suboxone. Defendant was wearing a black hoodie and a cap. There was testimony that Defendant was behaving oddly and that he eventually purchased a portion of a Suboxone strip from Dawna Peregoy for ten dollars. Defendant was made aware that the victim, Mrs. Peregoy, and Brandon Peregoy would be leaving the apartment shortly, and the victim told Defendant that if he had not found any drugs and was still sick the following day, the victim would give Defendant some of the pain medication that was locked up in the victim's mother's safe.

Defendant then left the apartment. A short time later, the victim, Mrs. Peregoy and Brandon Peregoy also left the apartment to go home. As they were leaving in their vehicle, three men wearing black hoodies approached the vehicle. One of the men went to the passenger's side window, and one of the men went to the driver's side window of the vehicle. Both were armed with guns and wearing bandanas over their faces. Brandon and Timbo Peregoy recognized Defendant as the person on the driver's side of the vehicle because he was wearing the same clothing that he wore earlier to Timbo Peregoy's apartment. Brandon Peregoy also recognized Defendant's voice and a tattoo on his neck. Defendant was holding a gun to the victim and according to Brandon Peregoy said, "Give us all your stuff." Timbo Peregoy testified that Defendant said, "Give it up man, just give me your shit." The victim told Defendant that he did not have anything. The man on the passenger side also held a gun to Mrs. Peregoy and said, "[G]ive it up." When Mrs. Peregoy told the man that she did not have anything, he began hitting her on the head with the gun. She began screaming for Timbo Peregoy who ran outside. The victim told the man to stop hitting Mrs. Peregoy, and he attempted to get

out of the vehicle. The victim then grabbed Defendant's arm when Defendant pointed the gun at Timbo Peregoy and shoved Defendant into a car. Brandon Peregoy testified that Defendant raised up and shot the victim in the knee. The victim fell against his vehicle, and "when he raised up again, [Defendant] shot him again." The three assailants then ran away. Timbo Peregoy testified: "I asked [the victim], I said, 'Do you know who it was?' He tried to say it and I said, 'Who, was it the person that was just at my house?' he said, 'Yes.'" Timbo Peregoy testified that he was "one hundred (100%) percent sure that Defendant was the person he saw outside committing the robbery.

Additionally, Karla Thacker testified that she saw a black Honda car parked in front of her and Timbo Peregoy's apartment when Defendant first came inside, and she saw the same black Honda leaving the scene after the shooting. R.G., a neighbor, verified that there were three men wearing black hoodies who were arguing with the victim and Mrs. Peregoy, and she heard Mrs. Peregoy say, "Leave us alone, leave us alone." R.G. testified that the victim "was just arguing with them and he seemed like he was trying to get it like to just go away and backup because of his hand motions and stuff but I couldn't really make out what they were saying." She then saw one of the three men turn around and shoot the victim. R.G. described one of the men as a little taller, and one was short and skinnier. She could not really see the third individual. Investigator Joey Whitlock testified that he was able to corroborate Timbo Peregoy's statement through other witnesses. He said that R.G.'s description of the assailants and the "voice talking" on the night of the shooting was similar to that of the Peregoy family's description. Investigator Whitlock further testified:

> [R.G.] described the three figures from the distance that she was, all pretty much in dark clothing, all with the dark hoodies, but as far as identifying facial features, no, but identifying – corroborating what they say the apparel these men were wearing, she said the same thing.

He said that R.G. agreed that the assailants were the same size as Defendant who she knew from being at the apartment complex because Defendant's brother, Josh Gergish, also lived there.

Although Defendant presented an alibi defense through Ms. Delfino, who said that Defendant was with her when the shooting occurred, the jury was free to disbelieve her testimony. The jury, as was its prerogative, accredited the testimony of the State's witnesses and resolved any discrepancies in favor of the State. Therefore, we conclude that the evidence is sufficient to support Defendant's convictions for criminally negligent homicide and two counts of attempted aggravated robbery. Defendant is not entitled to relief on this issue.

**CONCLUSION**

After a thorough review of the parties' briefs and the record in this case, all of Defendant's issues except for his challenge to the sufficiency of the evidence are waived. We decline to review the waived issues for plain error. The judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE